[No. F047425. Fifth Dist. Jan. 17, 2007.]

In re MARK COLLIN SODERSTEN on Habeas Corpus.

COUNSEL

Michael Cross, under appointment by the Court of Appeal, for Petitioner Mark Collin Sodersten.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Respondent the People.

OPINION

**ARDAIZ, P. J.**—More than 20 years ago, petitioner Mark Collin Sodersten was convicted of the special circumstance murder of Julie Wilson and related offenses. The jury spared his life. Sentenced to life in prison without the possibility of parole, petitioner pursued his appeal in this court and lost. Some 12 years after his conviction, this court directed the superior court to hear and determine petitioner's various claims in a habeas corpus proceeding. The habeas corpus proceeding remained in the trial court for six years while discovery and investigative proceedings ensued. During that process, it was discovered that at the time of trial, prosecuting and law enforcement authorities were aware of or actually possessed tape-recorded statements of the two key trial witnesses that contained inconsistent statements, as well as admissions of lying and coercive interrogation of one of the witnesses. These tape recordings were never disclosed to the defense. After consideration of all arguments, the trial court denied petitioner's writ, finding no prejudice in light of all the evidence.

In this court, petitioner pressed his claim that this suppression of evidence denied him a fair trial. We issued an order to show cause why the relief requested, a new trial, should not be granted. During briefing of the issues raised by the writ of habeas corpus, petitioner died in Corcoran State Prison at the age of 48.

There are many literary, historical, and legal descriptions of what constitutes a fair and impartial trial. We will not detail them herein. At the very least, a trial is a presentation of evidence, the purpose of which is to allow the trier of fact to resolve whether it can have sufficient confidence in the facts supporting the requested result, such that it is willing to find the result proved with the degree of certainty required by the type of case. Under the American system of justice, the high degree of certainty required in a criminal case, proof beyond a reasonable doubt, can sometimes result in the guilty going free. While this allows the presumption of innocence to prevail, it does not mean that the trier of fact has concluded the defendant is factually innocent. It does mean that guilt has not been proved by the standard required. An accused who has been acquitted, even though he or she may in fact have committed the crime charged, is entitled to be presumed innocent because guilt cannot or has not been proven with the degree of certainty required. Thus, under our system of justice, the guilty can go free in order to ensure as much as possible that the innocent are not convicted. This is an accepted consequence of a system of justice that places a high price on freedom—a system of justice for which this country has fought on numerous fronts and offered up innumerable lives to preserve and defend.

When a defendant is convicted, we conclude that the jury has resolved what the truth is for purposes of imposing the consequences the law demands. In that sense, a trial is a search for the truth (See, e.g., *Arizona v. Fulminante* (1991) 499 U.S. 279, 295 [113 L.Ed.2d 302, 111 S.Ct. 1246] (dis. opn. of White, J.).) However, what is fundamental to this search is that it "is not served but hindered by the concealment of relevant and material evidence." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].) If we expect jurors to do their job, they must be presented with all the evidence that is relevant and legally admissible for them to consider. It is then their duty to sift through that body of evidence to resolve what they can accept and believe. The withholding of admissible evidence from them can result in their drawing wrong conclusions and can undermine the certainty of their belief in other evidence that never had to be reconciled with the undisclosed information.

For the public to have confidence in the result, it must have confidence in the process. As the United States Supreme Court has observed, "Society wins not only when the guilty are convicted but when criminal trials are fair; our

system of the administration of justice suffers when any accused is treated unfairly." (*Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*).)

This case calls to account the American system of justice. For that system to have credibility we must respond. As we shall explain, what happened in this case has such an impact upon the integrity and fairness that are the cornerstones of our criminal justice system, that continued public confidence in that system requires us to address the validity of petitioner's conviction despite the fact we can no longer provide a remedy for petitioner himself. To discharge this writ as moot would be a disservice to the legitimate public expectation that judges will enforce justice. It would be a disservice to justice. Most of all, it would be a disservice to petitioner, who maintained his innocence despite a system that failed him. We will not perpetuate that failure and let silence endorse that result.

# I

## PROCEDURAL HISTORY[1]

By information filed February 14, 1985, in Tulare County Superior Court case No. 22976, petitioner was charged with the November 2, 1984, murder of Julie Wilson (Pen. Code,[2] § 187; count I). A knife use enhancement (§ 12022, subd. (b)) and special circumstance of murder during the attempted commission of rape (§ 190.2, subd. (a)(17)) were further alleged as to count I. Petitioner was also charged with attempted rape (§§ 261, subd. (2), 664; count II) and arson of an inhabited structure or property (§ 451, subd. (b); count III). The prosecution sought the death penalty.

On May 22, 1986, a jury convicted petitioner as charged. With respect to count I, the jury further found that the offense was first degree murder, that petitioner intended to kill Julie Wilson, and that the special circumstance and enhancement allegations were true. The jury subsequently returned a verdict of life in prison without the possibility of parole. On July 3, 1986, petitioner's motion for a new trial was denied, and he was sentenced to a total unstayed term of life in prison without the possibility of parole plus seven years.

---

[1] Pursuant to Evidence Code sections 452, subdivisions (d), (h) and 459, subdivision (a), and having previously notified the parties of our intent to do so, we take judicial notice of the following materials: (1) this court's records and opinion in consolidated case Nos. F007395 (*People v. Sodersten*) and F009338 (*In re Sodersten*); (2) this court's records and orders in case No. F030730 (*In re Sodersten*); and (3) the records of the State Bar of California, posted on its official Web site, concerning petitioner's trial counsel, Inderjeet Singh Aulakh, State Bar No. 47411 <http://members.calbar.ca.gov/search/member_detail.aspx?x=47411> (as of Jan. 17, 2007). (See *In re White* (2004) 121 Cal.App.4th 1453, 1469, fn. 14 [18 Cal.Rptr.3d 444].)

[2] Further statutory references are to the Penal Code unless otherwise stated.

Petitioner appealed (F007395), raising claims of insufficiency of the evidence, erroneous evidentiary rulings, instructional error, and prosecutorial misconduct. He also filed a petition for writ of habeas corpus (F009338), in which he alleged ineffective assistance of trial counsel. This court ordered the actions consolidated for disposition and, on May 3, 1988, we affirmed the convictions and denied the writ petition (*People v. Sodersten* (May 3, 1988, F007395, F009338) [nonpub. opn.]).

Apparently on April 27, 1997, petitioner executed another petition for writ of habeas corpus, which was filed in Tulare County Superior Court on July 30, 1997. The petition was denied on January 8, 1998. The trial court found nothing new or different from what was presented in the petition filed at the time of the appeal.

On May 5, 1998, petitioner filed a habeas corpus petition with this court (F030730). On July 23, 1998, we issued an order to show cause returnable before the Tulare County Superior Court for an evidentiary hearing. We directed that court to appoint counsel experienced in capital appeals to prepare an amended petition for writ of habeas corpus and to represent petitioner in the evidentiary hearing, and we directed counsel to address the circumstances relating to the identification of petitioner as the perpetrator by Nicole Wilson (the victim's daughter), together with any other issues that counsel deemed potentially meritorious and that were not previously decided on appeal.[3]

On or about August 19, 1998, the Tulare County Superior Court appointed counsel for petitioner. Counsel was subsequently relieved, then reappointed, at petitioner's request. Counsel then requested, and was granted, numerous and lengthy extensions of time in which to file the amended petition, many of which were occasioned by the need to compile the record and trial attorney's file (not all of which was still in the hands of trial counsel), obtain discovery from the district attorney's office, obtain fee payment approval from the superior court and the Tulare County Board of Supervisors, interview certain witnesses (some of whom no longer resided locally), and investigate newly discovered evidence. The amended petition was filed in Tulare County Superior Court case No. 39404 on July 10, 2003.

As noted, during the course of his investigation, counsel sought discovery from the Tulare County District Attorney's Office. As a result, the district attorney's investigator turned over, inter alia, tape recordings of interviews of Nicole Wilson by a prosecutor and member of his staff, dated March 3, 1986,

---

[3] For the sake of clarity, we will sometimes refer to Nicole, Lena, and Julie Wilson by their first names. No disrespect is intended.

and April 7, 1986. Counsel subsequently discovered, in possession of the Visalia Police Department, a tape recording of a December 1, 1984, statement by Lester Williams, a purported eyewitness who testified against petitioner at trial; and a surreptitiously recorded conversation between Williams and petitioner, recorded on December 14, 1984. Petitioner alleged that the four tapes were suppressed by the prosecutor and police. He also raised numerous other issues in his petition.

On March 12, 2004, the trial court issued an order to show cause.[4] It subsequently denied the petition without holding an evidentiary hearing. Following petitioner's ex parte application for reconsideration, the court set aside its August 23, 2004, denial, and set the matter for further hearing. On December 17, 2004, after conducting an evidentiary hearing, the court issued a second order denying the petition. The court incorporated its original order of denial and found, in part, that while the four allegedly suppressed tape recordings were not disclosed to defense counsel before or during petitioner's criminal trial, and their nondisclosure (even if not willful) deprived trial counsel of several opportunities to attack the credibility of two very important prosecution witnesses, there was no reasonable probability that, had they been disclosed, there would have been a different result at trial, nor did the information put all of the other evidence against petitioner in such a different light as to undermine confidence in the verdict.

On February 24, 2005, petitioner filed a request for appointment of counsel with this court. We deemed it to be a new petition for writ of habeas corpus (F047425), and appointed counsel, with directions to file an amended petition.[5] The amended petition was filed on June 23, 2005. After obtaining an informal response from respondent and informal reply to that response, we issued an order to show cause on April 20, 2006. Respondent filed its return on May 31, 2006, and petitioner filed his traverse on June 22, 2006.[6]

On June 25, 2006, petitioner died. His attorney furnished us with a certified copy of his death certificate, and moved for a summary grant of the petition. Respondent opposed the motion and moved to dismiss the petition and

---

[4] The matter was assigned to Judge Silveira, who had presided at petitioner's trial.

[5] We appointed Attorney Michael Cross, who represented petitioner in the writ proceedings in superior court.

[6] Respondent accepted this court's invitation to formally adopt its informal response and accompanying exhibits as the return in this matter. (See *People v. Romero* (1994) 8 Cal.4th 728, 741–742 [35 Cal.Rptr.2d 270, 883 P.2d 388].) In his traverse, petitioner incorporated by reference the claims and facts contained in his informal reply, together with the exhibits thereto; the amended petition for writ of habeas corpus with exhibits filed in this court; the amended petition for writ of habeas corpus with exhibits filed in the trial court; the court files and record from proceedings in the trial court, including the evidentiary hearing; and all exhibits filed in this matter. He also made certain specific denials.

permanently abate proceedings. We deferred a ruling on the motions. As we will explain, we have determined it is appropriate for us to address the merits of the issues raised in the petition concerning the nondisclosure of the tape recordings of Nicole Wilson, Lester Williams, and Williams and petitioner.

## II

## FACTS

A. *The Trial*[7]

In 1984, Kim Wallace and Janet Turner resided in an apartment complex at 420 East Houston Avenue in Visalia. The women were neighbors of Julie Wilson, who resided at 431 East Sweet Street. On the morning of November 2, 1984, Wallace and Turner went to Julie Wilson's apartment to borrow a plunger. As they approached, they noticed the curtains of Wilson's apartment were blackened. The front door was open a crack and Turner opened it further. Turner and Wallace saw Wilson's body on the floor. Wilson's daughter, Nicole, was covered with soot and sitting on a couch. Wallace and Turner ran to find Turner's sister, Renee Johnson, who called the police. The three women then returned to Wilson's apartment and Johnson called to Nicole to come out. Nicole kept saying there was something in her mother's eye. When Wallace asked, "Nikki, what happened?", the little girl replied three times, "Mark did it."

Visalia Police Officer Ernest Villa responded to the scene at approximately 10:49 a.m. He entered the apartment and observed the victim's body faceup in a spread-eagle position on the living room floor. Although the victim was wearing a sweater, there were no pants or underclothing on her lower body. Wilson had numerous lacerations on her neck and chin and her body was badly burned. The greatest degree of burning occurred in Wilson's pubic area; her genitals had been entirely obliterated by fire. Officer Villa found four Schaeffer beer cans between the victim's legs, a broken cooking utensil, a pot or pan, on her abdomen, a broken knife on the living room carpet, and a package of Camel filter cigarettes on the kitchen table.

Arson investigators George Sandoval and Scott Baker responded to the scene and determined the fire had been intentionally set. Although there was a smoke alarm in the apartment, the cover was slightly open and the alarm

---

[7] We adopt the statement of facts contained in our opinion on appeal. (*People v. Sodersten, supra,* F007395.) Double brackets with material enclosed indicate our insertions or additions; single brackets are contained in the source material. (See *Municipal Court v. Superior Court (Gonzalez)* (1993) 5 Cal.4th 1126, 1128–1129 & fn. 1 [22 Cal.Rptr.2d 504, 857 P.2d 325].)

could not work in this condition. The fire started on the area of the living room carpet between the victim's knees and her pubic area. Baker concluded Wilson had not been wearing clothing or panties on her lower body at the time of death because her upper thighs were not scorched. Baker testified scorching would have occurred had the clothing burned off.

Dr. Gary Walter, a pathologist, performed an autopsy on Wilson's body on November 3, 1984. The examination revealed scattered abrasions around the eyes, on the cheeks, and on the head, chest, and legs, lacerations on the ears, the cheeks, the lip and elsewhere, a complete fracture of the lower jaw, and a long, deep laceration of the neck which severed the trachea, the temporal artery on the right side, and most of the supporting muscles of the neck. Dr. Walter found considerable fire damage to the body. He found evidence of burning from the knees to the hairline and determined the fire had been concentrated in the genital area. The entire vagina and much of the musculature of the thighs had been consumed by fire.

Dr. Walter concluded the victim had been alive at the time the fire was set because a hemoglobin test indicated some inhalation of carbon monoxide. In his opinion, the cause of death was multiple stab wounds, particularly the wound to the neck. Dr. Walter believed the fire was a contributing cause but did not mention it in the protocol. Julie Wilson's blood-alcohol level at the time of death was 0.18. The victim's abrasions were consistent with being hit by a cooking pan or utensil. The jagged lacerations were consistent with being stabbed and/or cut by a broken but sharp instrument.

Wilson's two children, Nicole, age three, and Stevie, age two, were in the fire-damaged apartment when her body was discovered. Both children were completely covered with soot. Officers took the children to the Visalia police station. Officer Peggy Marvin called Tulare County Child Protective Services and arranged for both children to be taken to Kaweah-Delta Hospital for observation. Officer Marvin interviewed Nicole once at the Visalia police station and four times at the hospital. Marvin asked Nicole what happened and the minor said, "Somebody made a fire." When Marvin asked who made the fire, Nicole responded "Mark did" and said Mark was "Brian's daddy." Nicole explained Mark started the fire because "[h]im [sic] was mad at Julie." When Marvin asked why Mark was mad, Nicole said, "[t]hey had a fight." Nicole further told Marvin that Mark made a fire in the living room, he "put fire on Julie," and then he put the fire out. Julie Wilson's former live-in boyfriend was named Mark Dare. Dare was the father of Julie's son, Stevie, and had another son named Brian who apparently lived with Dare's parents in King City. On November 2 and 3, Nicole identified photographs of Mark Dare as the "Mark" who started the fire. When Marvin asked whether Mark used to live with them, Nicole first shook her head "yes" and then shook her head "no."

On November 5, 1984, Marvin returned to the hospital and displayed a photo lineup to Nicole. Nicole picked out Mark Dare's photograph and said he was the one who started the fire. She added that Mark had also hit Julie with a pan. Based on Officer Marvin's interviews with Nicole, Visalia police arrested Mark Dare on November 3, 1984, for the murder of Julie Wilson.

Further investigation revealed Mark Dare and his mother, Elsie Arnett, left Visalia on October 28, 1984, for the Arnett home in King City. Prior to departing, Dare and his mother drove Julie Wilson and her two children to the home of Julie's mother, Lena Wilson. Dare and his mother returned to King City and remained there until November 2. On that day they returned to Visalia to visit Mrs. Arnett's youngest daughter, who had given birth to a child. Dare's mother and stepfather testified Mark Dare was at their King City home on the evening of November 1, the evening Julie Wilson was killed. Dare himself testified he was in King City from October 28, 1984, through November 1, 1984, and he was at home throughout the evening of November 1.

Elsie Arnett testified she and Dare left King City at 2:00 p.m. on November 2 to visit her daughter in the hospital. They arrived at the outskirts of Visalia around 5:30 p.m. Dare needed tennis shoes so they stopped at several stores and purchased a pair before going to the hospital. Dare testified he telephoned Wilson's apartment while shopping for shoes. An unknown male answered and refused to give his name. The male told him Julie was around and the children were fine. Dare said he would stop by later. After visiting his sister at the hospital, Dare and Mrs. Arnett went to Julie Wilson's apartment at 7:00 p.m. Dare saw two acquaintances, Lester Williams and Mark Sodersten. He learned Julie was dead and the Visalia police were looking for him. Dare went to the Pump House bar and got drunk rather than turn himself in. He spent the evening at his sister's home and went to a liquor store in the morning. Visalia police arrested him as he was leaving the liquor store. Dare was armed with a knife at the time of his arrest. Visalia police eventually released Dare from custody after corroborating his presence in King City on the evening of the murder.

Later in November 1984, Nicole Wilson changed her story. Shortly after the murder, Nicole went to live with her natural father, James Simental. Simental's live-in girlfriend, Cassie Stockdale, heard Nicole speaking of a "good Mark" and a "bad Mark." Nicole explained the "bad Mark" was the one who "put the fire on her mom." Stockdale took Nicole to the Tulare County District Attorney's office. [[Then]] Deputy District Attorney Ronn Couillard showed Nicole one picture of Mark Dare and one picture of Mark Sodersten. Nicole said Dare was the "good Mark" and Sodersten was the "mean Mark that put fire on my mom." Julie's mother, Lena Wilson,

subsequently obtained custody of Nicole. Nicole spoke of "Mark" attacking her mother. Mrs. Wilson asked whether it was the Mark who used to live with Nicole and her mother. Nicole responded, "No, Grandma, not the good Mark, the bad Mark." Nicole said she knew the name "Mark" because her mother kept saying, "Mark, don't do it, please God, don't do it."

Visalia Police Officer Jay Frame saw defendant at a 7-Eleven store at about 6:00 or 6:30 p.m. on November 1. Frame recognized defendant from previous contacts on the street. Defendant purchased a six-pack of beer and left with another White male in a 1960's Ford truck. Frame subsequently reported his observations to the investigating officer in the Wilson homicide. Frame could not recall the brand of beer which defendant purchased. When the investigating officer showed Frame photographs from the scene, Frame remembered defendant purchased Schaeffer beer. Although he was familiar with Mark Dare, Frame maintained he had seen Sodersten at the 7-Eleven store on November 1.

Visalia police officers seized numerous items of physical evidence from the victim's apartment for analysis. The evidence included the Schaeffer beer cans found between the victim's legs. The California Department of Justice Regional Crime Laboratory in Fresno lifted a fingerprint from one of those beer cans. The print belonged to Julie Wilson's neighbor, Lester Williams. On November 1, 1984, Lester Williams lived with his mother, Elaine Williams, in Julie Wilson's apartment complex. Williams met Julie and Mark Sodersten through his friend, Mark Dare. Williams saw Julie walking through the apartment complex on Halloween Day, 1984. When Williams asked about Dare, Julie said they had fought and Dare left. She did not know when he was returning. On November 1, Williams was drinking beer with a "wino" at Oval Park on the north side of Visalia. Defendant drove up and invited Williams for a ride. As they drove around, Williams continued to drink beer while defendant drank whiskey. After driving around for awhile, defendant suggested they go to Julie Wilson's apartment.

The two men arrived at Wilson's apartment and knocked at the door and Wilson let them in. She was clothed when the two men arrived. Williams sat down at the kitchen table while defendant stood off to the side. According to Williams, defendant was "high" on alcohol. Julie got beers for Lester and herself and sat down at the kitchen table. Defendant then made a move toward Julie. He put his arm around her and said, "[t]ell us, baby, you know me, love me the way way [[sic]] you've been coming on to me." Julie replied, "Man, turn me loose. Don't do this to me. Why is you doing this?" Defendant told Julie to shut up. She arose and struck defendant as she tried to get away from him. Defendant got a grip on her and said, "Oh, Baby, I know you want to give me some pussy. I used to come out this while back and buy

you sodas and potato chips, you know. You was telling me right then, you know, come on, give me some of that pussy." Julie told defendant not to talk to her in that fashion and she tried to get away from him. Defendant grabbed a skillet near the table and began hitting her in the head and neck with it. Defendant told Julie to shut up or he would kill her. Julie struggled to escape but defendant felled her with blows from the skillet. Defendant continued to hit her as she lay on the ground and called her a "bitch" and a "motherf----r." Williams also heard defendant tell Julie, "You dirty bitch . . . I'll f--k you."

At this point, Williams attempted to intervene but he could not handle defendant. Defendant turned to Williams and screamed, "[S]hut up[,] motherf----r!" Williams was frightened and began running out of the apartment. He saw blood coming from Julie's upper right ear area, head, and neck. As Williams left, defendant warned him, "[D]on't say a motherf---ing thing about this, man . . . ." Williams ran across the street to his own apartment, walked past his mother in the kitchen, and went straight to bed.

[[Insofar as the evidence at trial showed,]] Visalia police interviewed Williams on three occasions. On November 27, 1984, Williams denied knowing anything about the murder of Julie Wilson. On November 28, 1984, Williams again denied any knowledge of the murder. After this interview the police learned Williams's fingerprint was on one of the Schaeffer beer cans. The police then conducted a third interview on the afternoon of November 28. Williams began by denying any knowledge of the murder. Officers told Williams that Sodersten was "pointing the finger" at Williams, saying Williams had asked Sodersten whether the police could lift fingerprints from a dead body.[8] After three suggestions of this nature, Williams replied, "He [Sodersten] might be the one, man, I want to tell you, man." Williams then implicated Sodersten in the offense.

Nine-year-old Nikki Florez lived in the same apartment complex as Julie Wilson in November 1984. Nikki was at Julie's apartment the evening before Julie's body was discovered. Julie, Kim Wallace, Nicole, and Stevie were also present. Julie departed, leaving Kim to babysit the children. A short time later, Kim departed, leaving Nikki in charge of the smaller children. After Kim left, someone entered the back of the apartment through the sliding glass door. The person asked for Julie. Nikki said Julie was not in the apartment and she did not know where Julie was. The person then said, "Well, tell her

---

[8] [[It appears the police first mentioned this to Williams during the November 27 interview, but Williams maintained that he could not tell them anything about what happened, knew nobody who drank Schaefer beer, and did not think Mark Sodersten was capable of killing Julie Wilson because the two were good friends. According to Williams, all he knew was that there were a lot of men going in and out of Julie's apartment since she made Mark Dare leave.]]

I'm going to kill her. I'm going to get her somehow." When Kim returned and knocked on the door, the man left through the back. Julie eventually returned and Kim left. The same man reappeared and came through the front door. Julie told the children to go play in their room. Nikki heard loud voices and "glass things" jiggling on the television set. At trial Nikki identified defendant as the person who entered Julie Wilson's apartment.

Janet Turner and Kim Wallace picked up Nikki at Julie's apartment at 8:00 p.m. on November 1. Turner saw defendant in the apartment and Wallace and Renee Johnson saw defendant's car parked at various places around the apartment complex. On November 2, Wallace and Turner were standing outside Julie's apartment after discovery of her body and the arrival of police. Defendant approached the women and asked what had happened. The women told him Julie had been killed. Defendant said he had been with Julie the night before and she had been fine at that time. Defendant then asked the women what Nicole knew or had told the police about the killing, how Stevie was found in the apartment, and where certain cans were discovered.

## Defense

Defendant did not testify on his own behalf. Defense counsel offered the testimony of defense witnesses to (1) establish an alibi for defendant on the night Julie Wilson was murdered; (2) show Mark Dare, rather than defendant, was Julie Wilson's killer; and (3) impeach various pieces of prosecution evidence.

## Alibi Evidence

Defendant's father, Gene Sodersten, testified he took defendant to the Victory Outreach drug rehabilitation program on October 30, 1984. Defendant left his car in the family garage and gave the keys to his father to hold. On the morning of November 1, defendant returned home by bus and lounged around the house the entire day. Defendant was in the house when his father went to bed at 9:30 p.m. Defendant's father still retained the keys to the car.

Defendant's sister, Jill Wheaton, was a nursing student in 1984. She lived with her parents and defendant at 1238 Whispering Pines in Visalia. Jill arrived home at 3:30 p.m. on November 1 after working on a project at the College of the Sequoias. Defendant was present and remained at home the entire evening. When Jill left at 6:00 a.m. the next day, defendant was sleeping on the couch. Gloria Van Zandt, Jill's friend, went to the Sodersten home on the evening of November 1 and stayed there from 9:00 p.m. to 11:00 p.m. Defendant was at home throughout this period. Defendant's mother, Elizabeth Sodersten, saw defendant at home throughout November 1.

Defendant's fingerprints were not found on any item seized at the crime scene. Although police officers took a hair sample from defendant in November 1984, the sample did not connect him to the crime. Nothing was seized from defendant's vehicle or home as evidence. Police discovered a pack of Camel filters on the victim's kitchen table. Dare testified Julie Wilson smoked Marlboro 100s, defendant smoked Camel filters, and he smoked regular Marlboros. Dare's friend, Laurie Thatcher, testified Dare smoked Camel filters as well.

## Culpability of Mark Dare

Nicole Wilson initially accused Dare of her mother's murder. James Simental, Nicole's natural father, testified as a defense witness. Simental and his girlfriend, Cassie Stockdale, were present when [[then]] Deputy District Attorney Ronn Couillard interviewed Nicole. In Simental's opinion, Couillard kept switching the pictures of Mark Dare and Mark Sodersten to the point Nicole seemed confused as to the identity of the "good Mark" and the "bad Mark." Simental testified he did not think Couillard's actions were intentional. However, he previously told a district attorney's investigator Couillard had pressured Nicole into identifying defendant. Lena Wilson, Nicole's grandmother, testified someone from the district attorney's office or child protective services took Nicole to the courthouse to orient her to the courtroom. This occurred about twice a week for the three weeks prior to trial.

Police discovered some physical evidence possibly connecting Mark Dare to the crime. The parties stipulated traces of blood were found on the handle of a knife seized from Dare on November 3, 1984. However, the knife was not tested for blood until May 2, 1986. Police found a piece of red elastic material with a silver snap on the victim's body. The material was consistent with that used for knapsack/backpack straps. Lester Williams testified Mark Dare commonly carried a knapsack. Dare admitted he always carried a knapsack and further testified he currently used a blue knapsack.

With respect to motive, James Simental testified he visited the victim on October 26, 1984, and Julie was arguing with an intoxicated Mark Dare. Julie was able to get Dare to leave with Simental's help. Lena Wilson testified Dare and her daughter often fought. She recalled seeing bruises on Julie about 10 days before the murder. Julie told her mother Mark Dare inflicted the bruises. Dare admitted he and Julie always fought and he occasionally hit her. During a fight several weeks before Julie's murder, Julie waved a knife and said, "I should stab you. You make me so damn mad." Dare initially denied knowing James Simental and then admitted Simental had spoken with

him. Simental said he (Simental) intended to get back together with Julie and move in with her. Dare claimed this conversation occurred several months before the murder.

Dare's mother, Elsie Arnett, testified she picked up her son in Visalia on Sunday, October 28. On the same date she also picked up some meat at Glick's Old Fashioned Meat Market in Visalia. Mrs. Arnett had previously left the meat at Glick's to be stored. Dare testified there was an ice chest full of meat in the car when his mother drove him from Visalia to King City on October 28. A partner and an employee of Glick's both testified the market was closed on Sundays. Although Glick's employees sometimes cut meat on Sundays, company records showed none was cut on October 28, 1984. Glick's personnel admitted they sometimes made special arrangements with out-of-town customers to pick up cut stored meat on Sundays. However, no such arrangement was ever made with Elsie Arnett for October 28. The Glick's employee remembered Mrs. Arnett bringing in precut meat and saying she was in town for the weekend because her daughter's baby was born.

Two witnesses who knew Dare well testified he was at a Halloween party in Tulare on the evening of October 31, 1984. At the time of his arrest, Dare told police, "A guy can't even come into town anymore to take his kids trick or treating without getting arrested and busted for murder." Dare was an admitted alcoholic but was not allowed to drink alcohol when he stayed with his mother and stepfather. Matt and Elsie Arnett lived in a trailer park and received phone messages through their neighbors. Police were unable to locate any neighbor who had seen Dare on the premises between October 28 and November 2.

Pamela Hamilton Curtis testified she was Dare's former live-in girlfriend. In her opinion, Dare was a good liar. Curtis testified Elsie Arnett always made excuses for her son. In 1977, Dare told his mother he had driven into a parked car and left the scene. Dare then left his apartment without saying where he was going. The police came looking for him 15 or 20 minutes later. Mrs. Arnett told police Dare was out of town and was not coming back. Dare returned to the apartment that evening.

Impeachment of Prosecution Evidence

The prosecution presented evidence to show defendant's car was visible in the alleyway behind Julie Wilson's apartment on November 1, 1984.

The defense presented testimony to show it was extremely dark in the alleyway on November 1. The defense also pointed out none of the police

reports contained Nikki Florez's statement about defendant entering Julie's apartment on the evening of November 1, 1984, and threatening to kill her.

## Rebuttal

The prosecution impeached defendant's alibi with testimony from Visalia Police Officer John Gomes. Gomes went to the Sodersten residence on November 30, 1984, to serve a search warrant and inform family members of defendant's arrest for murder. Defendant's father, Gene Sodersten, said defendant could not have killed Julie Wilson because he was home on the night of the killing. However, Gene Sodersten did not know what night Julie Wilson had been killed. Gene Sodersten also speculated his son's car was observed in the vicinity of the crime scene because someone may have hot-wired the vehicle and stolen it for that one night.

Mike Allen, brother of defense witness Billy Allen, contradicted Billy's testimony that Dare had been at the October 31, 1984, party in Tulare.

Finally, the prosecution introduced evidence to show the distance between Julie Wilson's apartment and defendant's home was 2.8 miles.

## Surrebuttal

Cozette Godown testified she was at a party in Tulare on October 31, 1984, and Mark Dare and Mike Allen were present that evening. The party moved to Billy Allen's home in Visalia later that evening.

[[This ends our quotation.]]

B. *The Undisclosed Tape Recordings*

As previously described, during the course of his investigation in conjunction with the writ proceedings, petitioner's counsel came into possession of tape-recorded interviews of Nicole Wilson, conducted on March 3, 1986, and April 7, 1986; a tape-recorded interview of Lester Williams, conducted on December 1, 1984; and a conversation between Williams and petitioner that was surreptitiously recorded on December 14, 1984.[9]

---

[9] We have listened to the tapes themselves, as did the trial court in conjunction with the writ proceedings. A written summary cannot accurately convey the tenor of the interviews and conversations. This is especially true with respect to those involving Nicole, since the interview techniques and *how* she answered questions are equally as important as her actual answers.

In certain instances, we were able to discern portions of the tapes that were transcribed as "inaudible." We previously have advised the parties of what our review of the tapes revealed,

*—March 3, 1986, interview of Nicole Wilson*

The first portion of this interview was conducted by Phillip Cline, the trial prosecutor. The second portion was conducted by his investigator, John Johnson. Throughout the interview, Nicole's tone was often playful, with a singsong quality to it. Sometimes she sounded reluctant; other times, bored, even when discussing the death of her mother. Occasionally, she sounded sad.

The interview began with Cline telling Nicole that he wanted her to pretend like they were in court. When he asked her last name, she responded, "Uh, Banana," and giggled. When he reminded her that they could not joke in court, she responded that her last name was Renee. Finally, when he asked if her last name was Wilson, she said yes. Nicole related that she was four years old, and that her birthday was in May. When asked about the color of the pen Cline was holding, she responded that it was red; if Cline told her it was green, it would be a lie, but if he told her it was red, that would be the truth. When Cline asked whether the truth was good or bad, Nicole said it was good; a lie was bad. When asked what happened if she told a lie, she replied, "You get a spankin'."

When Cline asked Nicole to tell him what happened to her mother, she asked whether they had to. Cline said yes, told her to pretend they were in court, and asked again. Nicole then giggled. When she continued to be recalcitrant, he told her that the "old judge" would get mad at her if she started "goofing off" in court. He again asked what happened to her mother; Nicole began counting, then, with further urging, replied, in a singsong voice, "She got killed by Mark." When Cline asked how she was killed, Nicole replied, in the same tone, "Fire, oil, and paper, newspaper," and that Mark put it on her mother. When Cline asked whether she saw it happen, she responded that she did not. He asked where she was, to which she answered, "Me not telling." Cline then observed that she was not being a good girl today, and he said he wanted her to be good and to tell him exactly, just like a big girl, and that they would play after. A short while later, when she continued to be playful, Cline asked if she wanted to get him in trouble, and said that he would get in trouble if she goofed off in court. He also said that he heard she "did real good the other day," and that he wanted her to do good today.[10]

and have afforded them the opportunity to address both the accuracy of our interpretation of the contents of the tape recordings, and our intention to rely on what we heard on the tapes. (See, e.g., *People v. Jennings* (1988) 46 Cal.3d 963, 978–979 [251 Cal.Rptr. 278, 760 P.2d 475].) Neither party has responded to our invitation.

[10] In light of John Johnson's references to exchanges he had with Nicole "yesterday" (see *post*), it appears likely there exist other statements made by Nicole, the contents of which we remain unaware.

Cline subsequently asked Nicole to look at some photographs. She counted to six, whereupon he asked if one of those people put fire on her mommy. Nicole's answer was both negative and emphatic. This ensued:

"Q [Cline]: You don't see one of em? Look at em close.

"A [Nicole]: No, none of em did.

"Q: Which one do you keep looking at?

"A: That one, that one, that one, that one, that one, that one.

"Q: No, there's one of em that you were looking at, which one is it? Is that the one you were looking at?

"A: Uh, huh.

"Q: Uh, huh. Point your finger to it. That's right.[11] Is that the one that put fire on your mommy? Huh?

"A: No."

Cline then asked if a particular one put fire on her mommy. Nicole said no, and that the person's name was Mark. When asked which Mark it was, Nicole responded that she did not want to tell. When asked whether it was the good Mark or the bad Mark, however, she said that it was "[a] good Mark." She responded affirmatively to questions whether he used to live with her and whether he had a son, and she gave the son's name as Brian. When asked who the other Mark was, she responded, "Bad Mark." She answered affirmatively when asked if he had been to her house before, and she agreed to point her finger at him if she saw him in court. This followed:

"Q: Okay, whose [sic] that?

"A: Mark that killed my mommy.[12]

"Q: And this, whose [sic] this?

"A: Mark that killed my mommy.

"Q: Is that the same person? Okay. Is that person in here?

---

[11] This was said with a tone of approval. It is impossible to tell whether it was approval of the fact that she pointed her finger, or of her choice itself.

[12] Nicole said this in a singsong tone of voice.

"A: Uh, yes.

"Q: Where's he at?

"A: He's on stage number two.

"Q: Alright. That's number two?

"A: Yeap [*sic*].

"Q: That's the same person that killed your mommy?

"A: That one, that one, and that one, and that one, and that one killed my mommy.

"Q: Okay. Is that one that you saw awhile ago that you were looking at? Is that why you were looking at him?

"A: No, that one goes with him, and that one goes with him.

"Q: Okay, that's the same guy? Alright. Okay, now you're doing good. You did good today. That's all we need."

After Cline said that was all they needed, Nicole asked if they could play now. Cline replied that he wanted to test her on something and was going to ask her some questions "just like they did in court the other day." After further discussion, Nicole said she was going to make something else. Cline responded, in a somewhat sterner voice, "I want you to pay attention to me Nicole. Now you're not being very good. You've gotta pay attention to me." Cline went on to tell her that, when the other man asked her questions, Cline wanted her to tell the truth. He elicited her promise that she would do so, and also when Cline was asking her the questions. This ensued:

"Q: Now look, if somebody, you know what happens when somebody tries to trick you?

"A: What?

"Q: Huh? Let's say that you told me, did you tell me that this man set fire to your mommy? Okay, and I'll, let's say that I'm this other man. And I come up and say, this man didn't set fire to your mommy, did he? What are you going to say?

"A: (inaudible) my mommy.

"Q: Huh?

"A: Did that one kill my mommy?[13]

"Q: I don't know, did he?

"A: Yes.

"Q: Alright. So that's what I want you to say if that's what's [*sic*] the truth is. But I want you to tell the truth. Okay? But what if this other man says, he didn't kill your mommy, did he? Are you going to change your mind?

"A: (inaudible), well he, he's the one that's falling down.

"Q: Yeah. What I'm telling you, hun, is you don't have to change your mind, okay? Cause you tell it just the way it is. All I want it [*sic*] you to do is to tell the truth.

"A: Look what (inaudible).

"Q: Okay, now, listen, listen to me, I don't want nobody scaring you into changing your mind. If you tell the truth, you stay with it. You understand what I'm saying? So if I come up to you, and I'm this other man, and I say, he didn't kill your mommy, did he? What are you going to say? [¶] . . . [¶]

"A: I don't know.

"Q: Are you gonna change your mind, and says [*sic*], no, he didn't? Or are you gonna say, yes, he did?

"A: I, I can't . . .

"Q: Huh?

"A: Understand. [¶] . . . [¶]

"Q: Listen to me, I told, you told me that this man put fire on your mommy, did he?

"A: Uh, huh.

---

[13] This is one of the instances where we were able to hear what apparently was inaudible to the transcriber.

"Q: Huh? Is that a, yes?

"A: Uh, huh.

"Q: Say yes if that's a yes.

"A: Yes.

"Q: Alright. If I'm this other man and I say, he didn't put fire on your mommy, what are you going to say?

"A: Change . . .

"Q: Huh?

"A: Change my mind.

"Q: Well you're not suppose [*sic*] to change your mind if that's the truth. You don't change the truth, do you?

"A: Ummm, nuh, uh.

"Q: Alright. So if he tries to change your mind, what are you gonna do?

"A: Not changing my mind.

"Q: That's right, okay? If you tell the truth, you stick with it. Alright? You don't let nobody mess you up like that.

"A: Uh, huh.

"Q: Okay?

"A: Okay.

"Q: Alright, let's try it again. This man set fire on your mommy?

"A: Yes.

"Q: Alright. Now the other man says, did, this man didn't set fire on your mommy, did he? What are you gonna say?

"A: Not changing my mind.[14]

"Q: Okay. You're gonna say, yes he did.

"A: (inaudible).

"Q: Alright?

"A: Okay."

Johnson began his portion of the interview by asking Nicole how Mark put the fire on her mommy. He noted that Nicole had told him the day before, and he wanted her to tell him again. After ascertaining that Nicole was still scared, Johnson reminded her that he had told her "yesterday" that no one would bother her or hurt her, and that he was a policeman and was going to take care of her. He then told her to "[t]urn around here," because he needed to talk to her some more. When Nicole still seemed reluctant, Johnson said that after she talked about what Mark used to put fire on her mommy, he would get a picture to show her. Nicole said she was done for the day, but Johnson said no. Johnson said, "She's doing a real good job. She's talking like a grown-up today. But she's having a little problem getting to this part. And you had a little problem with this part yesterday, but it's important Nicole. And I told you yesterday, nobodies [*sic*] gonna hurt you, didn't I? And I was gonna take care of you, didn't I? Well let's, let's, let's do it, okay? [¶] . . . [¶] Now turn around here. You're back looking the other direction again. I can't talk to you if you're looking that way cause I can't see your pretty little eyes."

When Johnson asked again how Mark put the fire on her mommy, Nicole answered, in a bored tone, "Paper, fire." When asked what kind of paper, her response was a singsong, "Newspaper." She said that he got it from the trash in the kitchen, but that he did not put anything else on her mommy besides newspaper. Johnson then asked what she had told him about "fire oil" the day before, and whether Mark did or did not put fire oil on her mommy. Again in a bored tone, she replied, "He did." When asked whether she saw him do that, she playfully responded, "Yes. No, no." When asked if that was yes or no, she responded, "Ummm," then giggled and said, "No." When Johnson said, "You didn't see him put the fire oil? How do you know he put fire oil then," Nicole made noises that sounded like, "I don't know." When asked if she was guessing, she giggled and replied, "Uh, huh," and that she was thinking. After being asked several more questions, she announced that she was not going to talk anymore. Johnson then began showing her photographs of her mother's house.

---

[14] This answer was preceded by a long pause.

Questioning subsequently turned to identification of the perpetrator:

"2 [Johnson]: Can you tell me who the Mark is that put the fire on your mommy, Nicole? Can you do that?

"A: I guess (inaudible).

"2: Pardon me?

"A: I need to see those (inaudible) again.[15]

"2: Those two Marks again, those pictures? Alright. Before we look at those pictures, I wanna ask you some questions about this Mark fellow. Can you tell me who this Mark is that put the fire on your mommy? That's who I'm only talking about. . . . Do you know anybody else that knows him? Does he have any children, little kids like you?

"A: Ummm, well Mark always lived with this one kid that's kid Brian.

"2: And this is the same Mark that put the fire on your mommy that has the boy named Brian? Are you sure he's the same Mark?

"A: He's a different kind of Mark. Does it stop . . .

"2: What?

"A: Mark, the, this Mark are [sic] Brian, Brian's dad. Some other Mark.

"2: Oh, it is? Tell me about this other Mark? Do you know anybody that knows him? Do you? Do you remem, do you remember a man named Lester? A black man that use [sic] to come visit with your mommy and you?

"A: Nuh, uh.

"2: He lived there by you. Do you remember Nikki? The little girl that use [sic] to come play with you? Alright. Brian's daddy, you know who I'm talking about? Do you know whose daddy Brian is? Do you know whose, whose [sic] the, the name of the father of Brian? Do you know who that person is? Do you know who I'm talking about? Alright. The Mark that has a boy named Brian, do you know who he is?

---

[15] This response, as well as Johnson's prior question, "Can you do that?" are also portions that were transcribed as inaudible.

"A: Who?

"2: The Mark that has a, a son named Brian. You just tell me about him. Do you know Brian? You ever talk with Brian? Huh?

"A: I don't know.

"2: The Mark that put fire on your mommy, is that Brian's daddy? It's the other Mark?

"A: No Brian, or Brian's dad.

"2: Who then?

"A: It's another Mark.

"2: Another Mark, alright.

"3 [another male voice]: How'd you know his name was Mark?

"A: Cause they, cause Brian and Brian's daddy would come and visits [*sic*].

"2: Not that, not that Mark. The other Mark. Not Brian's daddy, you know his name to be Mark. How did you know the other Mark's name is Mark?

"A: (inaudible) Brian?

"2: No, the other one.

"A: Brian's dad?

"2: No, the other one.

"A: Uhhh.

"2: How'd you know the other ones [*sic*] name was Mark?

"A: That one used to visit us, too.[16] [¶] . . . [¶]

"2: Okay. I'm gonna show you two pictures, okay? And I want you to, these two pictures are pictures of Mark. And I want you to show me that, put

---

[16] This is another response that was inaudible to the transcriber.

your finger on the pers, on the Mark that put fire on your mommy. Not somebody you know by the name of Mark. And not anything about a Mark. Except the Mark that put fire on your mommy. Put your finger on his picture. Okay?

"(Tapping noise).

"2: That's the Mark . . .

"(End of Side One).

"A: I don't know.

"2: Yeah, get your mouth off the desk, and talk here like a big girl again.

"A: I don't know. [¶] . . . [¶]

"2: Tell me again, which one put the fire on your mommy?

"A: That Mark, that's a different kind of Mark.

"2: What?

"A: That's a different kind of Mark. That one put fire on my mommy.

"2: This one right here. And this is Brian's daddy, right here? Yeah."

—*April 7, 1986, interview of Nicole Wilson*

This interview began with Nicole playfully stating that she did not know her last name. She and Cline again went through the differentiation between the truth and a lie, and that it was good to tell the truth and that the consequences of telling a lie were to get a spanking. In response to Cline's questions, Nicole related that "Mark" put fire on her mommy, and that this was not the Mark who lived with them, but "[s]ome other Mark." When asked whether the Mark who lived with her had any children, Nicole replied no. When asked if he had a little boy, she again replied no. When asked, however, if she knew a boy named Brian, she answered affirmatively. She also answered affirmatively when asked if that was Mark's little boy, although she said she did not know whether she had ever met Brian. When apparently shown photographs, she distinguished between the Mark who was Brian's daddy and lived with her, and the Mark who put fire on her mommy.

In response to further questioning, Nicole related that the one Mark got into a fight with her mother, and that they fought about the fire. This ensued:

"Q [Cline]: They were fighting about the fire? Now don't you guess. I want you to tell me what you know, okay? Don't guess. Do you know what it means to guess?

"A [Nicole]: What?[17]

"Q: Huh? That's when you don't know something and you're just giving an answer. I want you just to tell me what you know. Okay? So Johnny still ugly? No? And you're still pretty? Okay. Now how did the fire start?

"A: Ummm, I don't know.

"Q: Huh? Do you know something about some fire oil?

"A: Uh, huh.

"Q: What about it?

"A: Mark put papers in the oil.

"Q: The oil? Okay, and was the oil in a can or a bottle?

"A: A can.

"Q: Alright. What color was the can? Do you remember? Just tell me what you remember.

"A: Orange.

"Q: Orange, okay. And did he light a match?

"A: Ummm, yeah.

"Q: Or a cigarette lighter?

"A: Ummm, (inaudible) a cigarette lighter.

"Q: Okay. Now do you know that, or is that just a guess?

---

[17] The tone suggests Nicole was asking Cline, not that she did not hear his question.

"A: Just know that."

Cline elicited that Nicole was standing in the hallway when she saw this, and that she then went to her mother's room because she was scared Mark was going to put fire on her, even though he did not tell her that. She hid in the closet, while Stevie was asleep on her mother's bed. Nicole denied seeing a knife that night, although she did see some papers. This ensued:

"Q: Where were the papers?

"A: By my mommy.

"Q: Okay. Were they by your mommy, or on your mommy?

"A: On my mommy.

"Q: Okay, where at on her? Where at? Show me on your body where they were at?

"A: Do I have to?

"Q: Show me on my body? My big beautiful body? Huh? Just point. Huh? Nah, point. Where were they at?

"A: Head.

"Q: They were?[18] Was it covering up her head? Was there a blanket there? Did you see a blanket? Did you see a coat? Did you see a red coat? Huh? (inaudible) tell me . . .[19]

"A: Uh, uh, no.

"Q: Remember this is, huh? You gotta work now. You tell me the truth. Did you see any coats at all?

"A: No. I didn't see no coats, but I sure am tired.

"Q: You are, huh? Well we just got a little ways to go now. If you go straight through and work real hard, we'll be done real quick today. Okay?

---

[18] The tone of voice is one of surprise, with the inflection being exclamatory instead of questioning.

[19] Cline paused between questions.

Now sit up and look at me real pretty like a young lady. Come on now. I tried this with my little girl, and she can do it. There you go. That's good, that's better.

"A: (inaudible).

"Q: Alright. Did somebody put a blanket over your mommy's face?

"A: Nuh, uh.

"Q: Is that a yes or a no?

"A: That's a no.

"Q: Okay. Now, okay turn around, that's good. Did uh, did you see some cans? Look up here.

"A: Uh, uh, yes.

"Q: Where were the cans?

"A: By my mommy.

"Q: Okay, where'd the cans come from?

"A: Mark.

"Q: Where'd Mark get the cans?

"A: From the store.

"Q: When did he bring them to the house?

"A: Four o'clock.

"Q: How many cans did he bring?

"A: Five.

"Q: Were they in a package?

"A: Yes.

"Q: What kind of package?

"A: A brown package.

"Q: Did he leave after he brought the cans?

"A: Yes.

"Q: Okay, and then he came back later?

"A: Yes.

"Q: Where were you when he came back?

"A: Up in my mommy's room.

"Q: Okay, did you go out and see, see him there?

"A: No.

"Q: How'd you know he was there? Look up at me, come on now.[20] We just got a little ways to go. Come on Nicole. Remember, we've gotta do the work first. Nicole? Come on. Sit up and look at me like a young lady, just like you were in court. Remember, everybody wants to see how good little girl you are, okay?

"A: Okay.

"Q: So you sit up and look. That's it. Alright. Where were you when you first saw Mark?

"A: Oh, I don't know though.

"Q: Where was your mommy when you first saw Mark? Sit up Nicole.

"A: Uh, ummm.

"Q: Huh?

"A: I don't know.

"Q: Come on now. You're not answering my questions. Nicole? Sit up, hun. Nicole? Nicole? You wanna draw a picture now?"

---

[20] Nicole giggled at this point.

At this point, Johnson apparently drew an outline of Julie's residence. Nicole identified the various rooms, then marked where she was when she saw Mark put fire on her mommy. Cline elicited that Julie and Mark were standing up, fighting, and that Mark was hitting Julie with a pan. When he asked where the Black man was, Nicole answered, in a very definite tone, "There is no black man." She then stated that her mother had no clothes on during the fight with Mark, and that, after she fell down when Mark hit her with the pan, "She would be dead." When repeatedly questioned about precisely where her mother was struck, Nicole asked whether she had to tell Cline all of this.[21] He answered affirmatively, after which Nicole said she did not know what Mark did after he knocked her mother down, nor did she know where she herself went at that point. When shown the photograph of Mark, Nicole said that he was wearing the same clothes that night. When questioned further about whether he had the coffee cup and mustache shown in the photograph and what kind of shoes he had on, Nicole asked if she had to tell Cline. When he responded yes, if she remembered, she replied, "I don't remember." When Cline asked which bedroom she went into and whether she came back later on, this occurred:

"Q: What did you see when you came back out? Did you see your mommy?

"A: Blah, blah, yeah.

"Q: Okay, did you see Mark?

"A: Blah, blah, no.

"Q: Did you see anybody except your mommy?

"A: Nobody but my mommy.

"Q: Okay. Did you see Mark again that night?

"(Bang).

"A: Nope. I need another pen.

"Q: This one? Okay. Did you see Mark again?

"A: Yeee, yee, yee, no, no, no."

---

[21] Part of Nicole's question was inaudible to the transcriber.

Cline next elicited from Nicole that Mark got the fire oil from the store, although she did not see him get it at the store. She knew he did because she saw him go to their store. He was not with anyone. Cline subsequently asked if this was when Mark got the cans of beer. This ensued:

"A: How did you know he got beer?[22]

"Q: Huh? I just guessed. Did he have some beer there? How much beer did he get? How many cans?

"A: Fifteen.

"Q: Nah, come on now.

"A: It's (inaudible).

"Q: You're not starting to guess on me, are you? Huh?

"A: (inaudible).

"Q: Okay. You wanna take a five minute break?

"A: Yeah.

"Q: Okay. And then we'll do it again, and then we'll go get our ice cream."

—*December 1, 1984, interview of Lester Williams*

This interview was conducted by Detective Cody Woods and Sergeant John Gomes. Woods began by telling Williams that there had been new developments since the last time they talked, and that they needed to clarify a few things.[23] After reminding Williams that he had been advised of his rights, Woods informed him that they had arrested petitioner, who had denied being present. Woods told Williams that they needed to verify that petitioner was with Williams on the night Julie Wilson was killed. Williams said that he did not remember anything now, and that he had been "loaded." Woods told him: "The way things are standing right now, you are going to go to the electric chair unless you can help us find something else?" When Williams questioned the notion of going to the electric chair for something he did not do, Gomes

---

[22] The word "beer" was inaudible to the transcriber.

[23] The officers' voices are differentiated, but not identified, on the transcription of the tape recording. However, they are easily distinguished on the tape itself, in light of the fact Woods identified himself at the beginning of the interview. Given the issues before us, which officer said what is immaterial.

responded that it was possible because Williams was there, and Woods suggested Williams help them find someone who saw petitioner with Williams that night and who could say petitioner was not at home as his parents claimed. When Woods asked if petitioner went to Williams's house or if Williams's mother saw him, this took place:

"A [Williams]: Man, I don't know. I was kind of high, man. I'm serious, man. I was really fucked up (inaudible).

"1 [Gomes]: Well you said you were, you were driving around drinking with (inaudible), is what you told us before.

"A: Man, I had, I said, I, I don't remember, man. I swear I don't remember. I was really fucked up. I smoke [sic] some of that PC that Sherman that night. I don't remember. Cause I think I said (inaudible). [¶] . . . [¶]

"1: Okay, listen. Listen. Listen to me. You gave us some very good details about what happened, to a point, at Julie's house. Now I don't know how in the hell you could forget all the times before that, yet remember very explicitly that how he grabbed her, and how he hit her with a pan. Things that you would have to know to be there. Now I don't know how you can't, you can remember that so well, and you can't remember anything else before or after.

"A: I, I don't remember none of that shit, man, I'm serious.

"1: Well you remember some of it.

"A: Cause see, that, that Friday, I, you know, that Friday when I said about Julie, I don't, I don't remember nothing.[24] Cause all I know that night, I smoke [sic] a lot of Sherman that night, man. My mind is, I don't know, man. I'm, you know, I've been on this shit for awhile, man.

"1: That's bullshit. You's, you know it, but you're not gonna say it. You remembered what happened at Julie's house. You told us every detail up to a point.

"A: I don't remember saying none of that.

"1: You don't remember even talking to us at the (inaudible) at, at the Sheriff's Office, right across the way here? Last Wednesday, you don't remember that?

---

[24] The second reference to Friday was inaudible to the transcriber.

"A: I was loaded that day.

"1: No, you weren't loaded that day.

"A: Yes, I was[.]

"1: You were stone sober that day. Bullshit, you were stone sober."

The officers continued to press Williams, telling him he was "gonna do this rap alone" and would "fuckin' fry." Williams continued to insist that he had been "so fucked up" that he did not remember anything about Julie. When he said he was not even at Julie's house, Woods responded, "What we're gonna do right now is we're gonna go back to Visalia.[25] We're gonna forget about Mark. And we're going to the D.A.'s office. You're gonna be arraigned for murder, you're gonna be convicted, and you're going to the electric chair. It's simple as that." Williams again maintained he did not kill Julie, whereupon Woods told him to help them prove it, and to tell them who saw Williams with petitioner that night. When Williams denied being with petitioner, Gomes said they could prove Williams was in Julie's house. When Williams responded, "Well prove it man," Gomes replied, "Okay, we will, and we'll let you hang for murder alone. (Yelling) I don't give a shit!"

The rest of the interview continued in this vein, with Williams at one point accusing the officers of framing him, and reiterating that he remembered nothing because he "smoked so much shit that night." He maintained his lack of knowledge despite Gomes screaming that they could prove he was there and Woods calling him an idiot. At one point, this exchange occurred:

"Q [Woods]: Hey, we're trying to, we're trying to get . . .

"A: Man, all I know, I was loaded on that PC, man, I don't remember nothing, man.

"Q: We're trying to get Mark.

"A: I don't remember nothing, man, I'm, I'm, I'm trying to tell you the truth. You all don't have to believe me, man.

"Q: You know why we, the reason we took off Saturday to come up here was to help your ass.

"A: Man, you don't have to believe me, man.

---

[25] The interview was conducted in the Fresno County jail.

"Q: We came up here to help your ass. We thought well we'll go up there and Lester will tell us what, who he saw that night. We'll go back, cause Mark is denying it. He says, well we went over to somebodies [*sic*] house . . .

"A: (inaudible).

"Q: We drank beer with so and so. We went to the such and such liquor store and this, got the beer. We talked to these people. We go back, and they say, well yeah, we saw Mark and Lester together that night. Then we can, then we can get Mark.

"A: Man, I'll tell you, I, I can't tell you, man. I was loaded, man. I'm, I'm serious, man. I was really fucked up, man. I smoked all that Sherman, man. I, I, I don't remember a lot of shit, man.

"1: Well now we don't know if you smoked Sherman with. Or Irwin Water, or Irvin Waters. Or we don't know if it was with Mark. We don't if it was, we know you got, that you were at Julie's.

"A: I bought, I bought that shit from the, (inaudible) dude that's all I remember, man. I remember buying that shit, man. I bought a fifteen dollar piece. I smoked that all to myself. I remember that. But after that, I don't remember shit from my mind. When that shit hit me, man, I was just, I don't know, man, where I was at. I don't know.

"1: Well I'll tell you what, you were at that murder scene. That we can prove.

"A: No, I wasn't officer. [¶] . . . [¶]

"1: Don't, don't, don't we don't even wanna hear that because we know you, him and I can prove you were. So, so we don't wanna hear, I wasn't there bullshit. We don't wanna hear that shit.

"A: Yeah, but he threaten me like he wants to jump on me or something.[26] Man, you're hollering at me, man. You, you, you, you . . .

"1: Because I know you're lying. It makes . . .

"A: You know, (inaudible).

"1: It makes me angry when I know somebodies [*sic*] lying and trying to bullshit me.

---

26 The transcriber did not hear "but he threaten me."

"(All talking at the same time, inaudible).

"Q: Come up here . . .

"A: Hurt me or something, man.

"Q: We come up here on our day off to help you out.

"1: It's Saturday, we're not even working right now.

"A: Well why you started hollering at me, man?

"1: Because I think you're lying. I don't . . . [¶] . . . [¶]

"1: We went to Seaside yesterday to pick up Mark, and brought him back from Seaside to try to clear your story. And Mark's saying, I wasn't there. And his folks are saying, Mark was home the night Julie was killed. And they'll testify to that. So we're coming back to Lester, saying, Lester, if you, we know you were there, but if you didn't do it, give us some information to prove that Mark was there, or to prove that somebody was there.

"A: Man, I don't remember nothing. Man, I'm trying to tell you, man, I was so fucked up, man. Off of that shit, man. I'm not lying, man."

—*December 14, 1984, conversation between Lester Williams and petitioner*

In this conversation, which apparently was recorded while Williams and petitioner were being transported in a police van, petitioner asserted that "they" knew he "wasn't even anywhere around there that night." Williams told petitioner that "they" had said petitioner told them Williams asked if they could get handprints off a body. Williams stated: "You know I didn't say that. And so, well you wanna lie against me, well, I can lie too, baby." When petitioner denied he was trying to frame Williams, Williams responded that he (Williams) did not kill anyone, and he told petitioner: "They said, you said that against me. I said, well, he wanna lie, I can lie too. And I told em, I made up my a statement, because I made that cause what you said against me, man. I said, why me?"

When petitioner protested that Williams knew petitioner was nowhere near the scene, Williams responded that petitioner knew Williams did not know anything about it, either. This ensued:

"M [petitioner]: I'll tell you one thing, man, I ain't lying about nothing. You hit, you hit me up with that question. That don't mean nothing. It doesn't, you know?

"L [Williams]: It, it doesn't, it doesn't, man, but why, but why, why, why you give that statement against me, man, like that on me, man? Say I said you get the get off, a print off a body, man?

"M: Maybe you know who done it. You know what, but you know, you know I wasn't nowhere around there. You know, maybe you saw who done it Les.

"L: Man, I ain't saw nothing, man. Uh, the, the, the principle part about it, man, when you told uh, and lied, and told em I said, can you get a print off of that, man. I cried. It hurted me, man, to the teeth. I said, well if he wanna lie, I can lie. And I told that statement I gave em . . .

"M: Uh, huh.

"L: It wasn't no true story. I made that up what he made against me."

Williams subsequently reiterated that he had not told the truth, had made things up because he was angry about what petitioner had said against him, and would say in court that his statement was not true. Petitioner urged Williams to come out with the truth, if he saw anything. Petitioner said the police knew he was not there, and that he had been at a big party that night and had stayed with "two broads." Williams responded that he had been with his mother that night, and he again said he would admit his statement about petitioner was untrue. Williams said: "But I'll, you know, I'll tell em, I said, hey, that statement I gave, it, it, it was a false statement for what he said against me, man. You know, he said something against me. I said something a [*sic*] back against him. . . ." Williams later promised again to admit it was a false statement, and that he said it because petitioner had said something against him. At one point when petitioner asked whether Williams knew anything about what happened, Williams replied, "Hell, no, man. If I did, don't you know I'd been told that shit, you know, I wouldn't be in like this here. Shit, if I did, man, I won't be like this here. Shit. I ain't that stupid."

Petitioner reiterated that he was at his cousin's party that night, and that he had 15 witnesses to that fact. Williams subsequently said, "I just told them it was a bunch of bullshit what I made up, I just told them that man," and that he made it up because of what petitioner made up against Williams, i.e., that Williams had asked whether prints could be gotten off a dead body. He later told petitioner: "They're just gonna force me to make me say you did it, if

you don't say that against Mark. You're gonna ride the whole beef by your God damn self. I said, what can I tell you, the man, you know, that statement I gave was false. Cause what he said against me wasn't true. [¶] . . . [¶] I told em just like that Mark." He subsequently said: "It was wrong what I said against you, Mark. But you know, that's not gonna hold up in court. See all, if you . . . [¶] . . . [¶] That's not gonna hold. Cause I'm gonna tell em right there in front, the statement I gave was false, and what he said against me, was fal, I'm just upset. I just made up any mother fuckin' thing, man. Is, is not true against him, man, what I said. See I'm not, you know, it's not gonna hold, you know. I shouldn't have said it, but I was upset when they came back . . . ." He repeated that he would say he made up a false statement, and that, "I shouldn't have said it like that, but I'll couldn't understand why you said, you know, told them can you get prints off a dead body. So I made that up (inaudible)." This exchange ensued:

"L: You know, I, you know, it was wrong what I said, man. It was wrong what you said against me, man. But that is not gonna hold out, you know. I'll tell that statement, that it was false statement, it wasn't true. Cause I don't know nothing. This man, I ain't seen that, man.

"M: You get done, you get on that false statement, and I'll see if I can jog my memory of what you were asking me.

"L: Well I'm gonna tell her, I already told em it was a false statement, and if I have to say it in front of the D.A. (inaudible). It was a false statement cause he said it against me, I just made it up, you know? What he made against me. Well you should have told em that what, you know, mine was a, yours was a false statement what you said against me, man. I'm not just jump up and hang nobody for nothing, man.

"M: You come to the truth, man, I'll jog my memory.

"L: Man, I'll, I'll come all the way to the truth, baby. [¶] . . . [¶]

"M: They already know I have about thirteen witnesses from Lanell's party.

"L: But, but, but you got to tell them that the statement you gave against me wasn't true now.

"M: Well you get on with the truth, man, and I'll jog my memory, you know? [¶] . . . [¶]

"M: You get down with the truth, man. You get down with the truth.

"L: Oh, I'll, I told you I'm gonna tell my part. You just tell your part that your part wasn't true what you said against me. You (inaudible) to worry about, or I'm gonna tell it was a false, you know, statement.

"M: Okay. Okay. I wanna hear this, I wanna hear this, man. I wanna make sure, I wanna guarantee that you come out with the truths and tell them that. Cause they're calling my witnesses liars. And there's thirteen of em.

"L: Is you gonna say yours against me?

"M: Huh?

"L: You gonna say your, you say you, and I'll say mine, that it was a false statement.

"M: You come out with the truth . . .

"L: What I said . . .

"M: Man, you make the first move, and you come out with the truth. You come out with the truth, man.

"L: Is you gonna make your move?

"M: You make the first move. . . ."

C. *The Writ Proceedings in Superior Court*

Petitioner's main contention in the writ proceedings in Tulare County Superior Court case No. 39404—and the one on which we focus—was that he was denied a fair trial by the prosecution's suppression of the preceding four tapes. Petitioner supported his claim that these tapes were never disclosed to the defense with declarations from:

—I. Singh Aulakh, petitioner's trial counsel. Aulakh stated he never received or knew about the tape recordings of Nicole or Lester Williams. Had he known of them, he would have used their contents to challenge Nicole's competency and to impeach her trial testimony, to impeach Williams's testimony, and to rebut arguments of the prosecutor. Other members of the defense team also submitted declarations in which they denied knowledge of the tape recordings, as did the attorney who first represented petitioner in this case.

——Ronn Couillard, the prosecutor assigned to the case through the preliminary hearing. Couillard stated he was unaware that Lester Williams had made a statement to detectives on December 1, 1984, and so did not give defense counsel a copy of that tape. He knew Williams and petitioner had been surreptitiously recorded, but did not recall whether he had the tape. If he did, it would have been his practice to give it to defense counsel.

——Michael Cross, counsel for petitioner in the writ proceedings. Cross stated that he received the tape recordings of Nicole from the district attorney's office in response to his discovery request of August 24, 2000. Neither tape was in the trial attorney's file. Cross first learned of the Lester Williams tape recordings, which were in the possession of the Visalia Police Department, on September 29, 2000, and received copies of them on March 14, 2001. Neither tape was in the file of either the trial attorney or the district attorney.

Petitioner argued the tapes of Nicole were material and favorable to the defense in part because the tenor of her responses to the questions of prosecutor Phillip Cline and district attorney's investigator John Johnson demonstrated her immaturity; her responses would have impeached her in-court identification of petitioner's photograph as depicting the perpetrator; and the tapes would have supported the defense contention that Nicole was coerced. He supported his assertions with a report from Dr. Madeline Daniels, a forensic/clinical psychologist, who opined, based in part on her review of the tapes, that Nicole was an unreliable witness at the time of trial. Petitioner argued the tapes of Lester Williams were material and favorable to the defense because Williams stated, contrary to his testimony at the preliminary hearing and trial, that he did not see petitioner do anything because he was not there; he admitted lying about petitioner's involvement; and the tapes showed that his statements incriminating petitioner were false, coerced, and involuntary. Cumulatively, petitioner argued, the four tapes undermined the prosecution's entire case.

In their return to the trial court's order to show cause, the People responded, in pertinent part, that Nicole Wilson's identification of petitioner was not compromised by the asserted suppression of her taped statements, as the trial transcript made it clear the defense had the tapes, and the statements were not exculpatory.[27] The People supported the claim the defense had the tapes with declarations from:

——John Johnson, the district attorney's investigator on the case. Johnson stated he was present during the courtroom familiarization sessions with

---

[27] The People did not raise a claim of untimeliness or other procedural bar with respect to any of the tape recordings at issue.

Nicole, both of which were recorded with the intent that the recordings would be provided to the defense. It was Johnson's practice to provide all tape recordings of witnesses to the defense as they became available, and he believed the tapes were disclosed to defense counsel. Johnson denied being aware of the Lester Williams tapes, which were not in the district attorney's file prior to trial.

—Phillip Cline, the trial prosecutor. Cline stated that the recordings of Nicole were made with the intent that they be provided to the defense and in order to rebut any allegations that the procedure predisposed the witness to testify in any particular manner. Cline's practice was to provide all tape recordings of witnesses to the defense as they became available, and he believed that the tapes were disclosed to defense counsel. Cline denied being aware of the Lester Williams tapes, which were not in the district attorney's file prior to trial.

The People conceded that the Williams tapes should have been disclosed to the defense. They argued, however, that the tapes were not exculpatory in that they did not affirmatively state petitioner's innocence; moreover, while they would have provided a further avenue for impeachment of Williams's credibility, Williams's trial testimony was thoroughly impeached and did nothing more than place petitioner at the crime scene and give Williams's observations of the initial attack. In sum, nothing on either tape would have lessened the corroborative impact of the physical and other testimonial evidence that supported Williams's testimony, and there was no reasonable probability the outcome of petitioner's case would have been different had he been provided with the undisclosed Williams tapes.

After petitioner filed his traverse, the trial court deemed the matter submitted on the pleadings, exhibits, trial transcript, and opinion rendered by this court on appeal, and issued an order denying the petition. In part, the court found no willful misconduct by the prosecution with respect to the tapes in issue. It did find, however, that none of the tapes were given to defense counsel. The court concluded that, even if not willful, the failure to disclose the tape recordings deprived defense counsel of several opportunities to attack the credibility of two very important prosecution witnesses. It framed the question before it as whether the undisclosed evidence could reasonably have put the case against petitioner in such a different light as to undermine confidence in the verdict.

With respect to the tapes of Nicole's practice sessions, the court concluded that Nicole properly was found to be a competent witness at trial, but noted that the inconsistencies in her court practice sessions, as demonstrated by the undisclosed tape recordings, were not available to defense counsel for

purposes of cross-examination or to reinforce his argument that the prosecution had impermissibly suggested the necessity to choose between a "good Mark" and a "bad Mark." The court also noted, however, that some of Nicole's responses (for example, that her mother was struck with a pan on the front of her face) would have been damaging to the defense. The court concluded that the fact of the practice sessions and Nicole's responses were not of sufficient materiality that, had they been disclosed to the defense, a different trial result was reasonably probable. The court reasoned that the jury had the opportunity to observe Nicole testify, and that she clearly identified petitioner as the Mark who put fire on her mother. Additionally, the tape recordings would have shown her memory for some details to be much better a short time before trial. The court further reasoned that a claim of implantation of memory had to be examined in conjunction with the evidence of Nicole's first explanation of two Marks, and that this was done within a relatively short time after her mother's death, in circumstances that, as shown particularly by the trial testimony of Lena Wilson and Cassie Stockdale, revealed no prompting.

With respect to the Lester Williams tapes, the court observed that, while Williams's purported failure to remember, as maintained throughout the December 1 interrogation, "might have served as additional fodder for impeachment, fodder was not lacking," and defense counsel was able to impeach Williams extensively at trial. Given this extensive impeachment, the court concluded, failure to disclose the recording of the December 1, 1984, interrogation did not deprive petitioner of a fair trial or put the other evidence against petitioner in such a different light as to undermine confidence in the verdict. The court reached the same conclusion with respect to the surreptitious recording of the December 14, 1984, conversation between Williams and petitioner, as impeaching evidence was presented at trial that Williams implicated petitioner in order to escape prosecution himself, and the undisclosed conversation merely furnished evidence of a different motivation, i.e., spitefulness. As for petitioner's argument that the tape recording could have been admitted as exculpatory evidence on his behalf at trial, the trial court noted that, to the extent petitioner denied participation in any crime, the statement would have been hearsay unless petitioner testified and the tape was offered as a prior consistent statement. The court found such a tactic "fraught with difficulty" since petitioner twice recounted an alibi that contradicted the alibi he presented at trial.

Petitioner moved for reconsideration on the ground that this court issued an order to show cause and ordered an evidentiary hearing, in addition to which the parties' pleadings demonstrated the existence of numerous factual disputes. The court granted the request for reconsideration and vacated its order denying the petition. Having already considered all of the declarations and

other exhibits presented in conjunction with the parties' pleadings, it also reopened the matter for the taking of further evidence.

At the evidentiary hearing, petitioner presented the testimony of forensic psychologist Madeline Daniels, who, for the past 10 years, had had specific training in using forensic interviewing techniques with children. Daniels had approximately 17 years' experience in working with children and, over the 30 years of her career, children and adolescents had composed a third to a half of her practice. Her experience included several hundred hours with child protective services in Humboldt County, in which she was called upon to evaluate children's statements and reports.

According to Daniels, the main problem in evaluating children's statements lies with the issue of suggestibility. Children look up to adults and are constantly taking their cues from adults. If an adult says something is true, it is true. Although children under age six may know it is bad to lie and can understand "truth" when confronted with the color of something they can see, they lack the brain growth and development necessary to allow them to understand the concept of telling the truth. If a child does not have the brain development necessary to understand the duty to tell the truth, it is possible for him or her to give a false answer to a question without knowing it and, depending on the definition, without telling a lie. The lack of brain development also impacts issues of suggestibility and memory implantation.

In order to assess reliability in any child witness, factors to be considered are the trauma itself, the interview process, and other outside influences. As to the trauma itself, memory is affected by physiology, which in turn is affected by stress. In someone who is extremely stressed, things are stored differently and, since someone undergoing a traumatic event pays attention to different things, he or she may misperceive or misinterpret what is occurring. As for the interview process, the way in which questions are asked, whether suggestions are planted or not planted, the tones of voice, and the general atmosphere are all pertinent. A lot of leading can occur without adults realizing they are doing it. Coping strategies also come into play. How a person has learned to cope in the past affects how that person remembers and his or her ability to retrieve that information. Someone who is used to denying traumatic things when they occur will be more likely to forget or to be unable to retrieve the information. Other pertinent considerations are factors such as the time from the event to the interview, whether there have been multiple interviews, any kind of intimidation or coercion, any kind of misleading questions, younger versus older, weak memory for the event, negative stereotyping, and implied knowledge of alleged events.

With respect to this case, Daniels reviewed many materials concerning Nicole, and, as a result, formed the opinion that Nicole was not a reliable

witness when she testified at trial. In Daniels's opinion, Nicole's first identification, of "Brian's daddy," was more reliable. Particularly given Nicole's young age, and because a year is longer for a child than for an adult, a lengthy delay decreases reliability. In Daniels's experience, it was very likely that denial was one of Nicole's coping strategies, given her apparent milieu of drug use and possible physical violence. This would make the testimony farthest away from the event the less likely to be reliable: Nicole would be unlikely to remember because one of her strategies for surviving would be to not remember unpleasant events. At the time Nicole was interviewed by Officer Peggy Marvin, the event was relatively fresh. Marvin's interviews were very short, and she was gentle and kind; there was no particular assumption about what had happened; and when Nicole said she did not want to talk about something, Marvin did not pressure or coerce her. That was another relevant factor, because children in our culture are expected to give an answer when adults speak. This expectation is one of the reasons they may fabricate something. Additionally, by the time of trial two years later, there had been multiple interviews, which are a known factor in creating suggestibility. Thus, there were numerous reasons why the first interviews were more credible than the later ones. The same was true of Nicole's twice picking out a photograph of Mark Dare. The identification was relatively spontaneous, especially when compared to what happened later on, when no spontaneity was left.

In analyzing what took place in Ronn Couillard's office prior to the preliminary hearing, Daniels noted that photographs were shown to Nicole. Someone who has been shown a photograph will be more likely to pick that photograph out of a photographic lineup because he or she recognizes it from somewhere. The transcript of James Simental's trial testimony suggested Simental originally felt there was some amount of pressure at the interview, as well as some confusion, although he decided it was not intentional. Initially, Simental said Nicole "was just trying to make us happy because it was evident who they were trying to accuse." Children sense the expectations of adults, and they respond. They look to see what makes adults happy. That Cassie Stockdale did not notice anything made sense because she was not the biological parent and so was not paying the same kind of attention as Simental.

In Daniels's opinion, Nicole's reliability had been contaminated by the time of the Couillard interview. As demonstrated in the third interview with Officer Marvin, Nicole had already turned away from the event—pushed aside a memory—for three months, an enormous amount of time to her. Couillard's showing Nicole photographs at that point would have impacted her at a very susceptible time and could have played a part in confusion. Nicole was more likely to remember things she was seeing at the then present

time than the image of what happened three months earlier, so the photographs now became the memory.

With respect to the interviews of Nicole memorialized on the undisclosed tapes, Daniels opined that the manner in which the March 3, 1986 interview was conducted "really undermined any credibility that [Nicole] had."[28] Nicole was never offered the option of responding that she did not know or remember or understand. Such things are not obvious to a child, especially one under the age of six. A more proper technique would have been to tell her that one of the rules in the courtroom was, if she really did not know, to say she did not know, and that it would be all right to give such a response.[29] Instead, the lack of an option to not remember or not know, coupled with the courtroom being made to sound dangerous and threatening, would cause a child to think about what he or she would have to say in order not to get the spanking or not to get the judge mad.

Daniels viewed Nicole's initial response as indicating she was playing games and might not remember. Further, Nicole was very resistant to talking about her mother. Unlike in the interviews with Officer Marvin, Nicole was pressured when she did not want to speak. Any time Nicole did not know or did not want to talk or acted like she was guessing, Cline grew stern and his voice changed. That voice was a good clue for a child Nicole's age that she had to have an answer, and that he was the adult in charge of right answers. Cline made it very evident when Nicole's answer was what he wanted to hear. Whenever Nicole tried to avoid a subject or did not give the "right" answer, Cline would "hammer" at it and keep going back to it.

A child Nicole's age has a willingness to please, and Nicole's responses showed repeated evidence of this. She was given clues as to what answer the interviewer was seeking. Sometimes she responded in almost a singsong voice, as children do when they are answering something they have learned

---

[28] The trial court rejected the People's objection that what occurred was not an interview per se, as discussion of the case was secondary to an intent to familiarize the witness with the court process, court decorum, and what to expect while in the courtroom. The trial court reasoned that Nicole clearly was asked about the events that she witnessed surrounding her mother's death, and so Daniels was entitled to state her opinion about the effect of the interactions on the reliability of Nicole's testimony. Daniels subsequently noted that, normally when someone "plays court" with a child in order to introduce the child to a courtroom, the person lets the child know that there are people doing different jobs in the courtroom, and what those jobs are, and that it is okay for the child to be there. It is inappropriate to focus on the child's testimony; instead, the focus should be on the child being comfortable in a courtroom.

[29] According to Daniels, the issue of proper interview techniques was a common one in the early 1980's, in light of the McMartin Preschool case and others. In 1984, and especially by 1986, information on the subject would have been accessible.

by rote and not really internalized.[30] This and the fact Nicole was given the message, verbally and nonverbally, that it was not all right not to remember or not to have an answer, was about the highest pressure that could be put on a child. This made the answers she gave after the rehearsals less reliable because of the positive and negative reinforcement. Whatever the agenda of the interviewer, it came across that there was an agenda, and that Nicole's answers of "I don't remember," "I don't know," or "I don't want to say it," were not acceptable.

Daniels considered this "a primary problem," because if a child has to come up with something, he or she is going to come up with what pleases the adult. A prime example was when Nicole was asked to identify the photograph of the person who put fire on her mommy. The message conveyed to Nicole by the questions asked and the manner in which the interview was conducted, was that the agenda was to pick one of the photographs, and that the interviewer did not care about the truth in an objective way. When asked which photograph she was looking at, Nicole selected one, but Daniels found her response to be "totally without conviction." When Nicole was asked which one she was looking at, it was a very clear suggestion that there was one that she was looking at, and that the adult expected her to be looking at only one of the photographs. In Daniels's opinion, there was a good chance that kind of question would implant a suggestion. When the interviewer told Nicole to point her finger at the photograph and she apparently did, he said, "That's right," again sending a double message and indicating that the search for an accurate recollection from her was totally absent. Moreover, on many occasions, Nicole answered negatively or said she did not know. However, "the truth of not remembering [was] not allowed." Because the questioning continued and Nicole wanted to please the adults, she tried to come up with something. When a child does not know, but does not have the option of saying so, he or she may engage in fabrication. This does not mean out-and-out lying, but the child guesses the answer as a survival mechanism.

To Daniels, the questions, changes in voice, positive and negative reinforcement, and conveying of the message that there was an agenda, were all extremely suggestive. In her opinion, Cline's asking Nicole whether a certain photograph was the one she was looking at and then telling her, "That's right," "completely contaminated" Nicole's in-court identification. Even unconsciously, Nicole's memory would subsequently associate the "fire on mommy" and that photograph. Additionally, she had all the reinforcement of knowing that, when she pointed to that picture, then she could stop. Daniels

---

[30] In Daniels's opinion, Nicole's use of a singsong voice when identifying the Mark who killed her mother, showed a "totally inappropriate affect." If she were actually remembering something, she would sound very different. Instead, she sounded happy to have figured out the answer for which the adults were looking.

considered this to be "very serious" contamination. In Daniels's experience with children, when an answer has been suggested and then later there is testimony in court, it is possible that the child is testifying to the answer that was suggested, and not the actual event. This was especially true here, since there were many reasons Nicole would not remember the actual event, including coping skills, the impact of the trauma, her age, and how a large proportion of her life had gone by since the actual event.

Similar problems were evident in the second portion of that tape, where the interview was conducted by John Johnson. Daniels found no indication that Nicole was actually remembering, except possibly for the times that she was most inaudible or not talking or when she had her back to the adults. If memories started to intrude, she pulled completely away. The fact Nicole was reluctant and resistant could indicate she could not remember, it was too painful to remember, or it was too far away to remember. Additionally, many of Nicole's answers about the event had a rote quality to them. She was not reconstructing or reliving the events, and there was no indication of actual memory. The only way to get a rote quality to memory is to rehearse it and, in Daniels's opinion, the rote quality was more likely coming from the rehearsal. This happened every time Nicole was asked for details. An example was the Black man. The interviewers continued to refer to the Black man, no matter how many times Nicole said no. That kind of suggestion is very powerful. This kind of repetition and returning to the subject interferes with the ability to remember. It does not elicit memory, because at some point, the child is remembering what happened a few transcript lines above or several minutes earlier.

Daniels also found the transcript and recording of the April 7 interview relevant to the reliability of Nicole's trial testimony. The "real hesitancy" in Nicole's responses to various questions sounded, in Daniels's opinion, like children who are trying to find out what the adult wants or expects them to answer. Daniels also felt it was relatively clear Nicole did not want to talk about the night her mother was killed. Daniels heard none of the emotion that would lead one to believe Nicole was actually remembering her mother's death. Her responses had no quality of conviction. The overall feeling in both interviews was that there was no indication Nicole was actually remembering.

The overall quality of the April 7 interview was very similar to that of the March 3 one, in that many questions were very leading or were asked in a tone of voice that sounded like what adults would call a rhetorical question. These were not really questions, but conveyed the message that the interviewer knew the answer he expected to get. Nicole's responses, when asked about various photographs, remained tentative, again suggesting a child trying to find the right answer. The interview contained numerous indications that

Nicole did not know, did not remember, or was guessing, with the exception of a few times when she did not want to talk or turned her back. That was a child's attempt to deal with any trauma that would arise from even approaching a memory. In addition, there were numerous examples of what Daniels characterized as "drilling" Nicole. When a child engages in the process of pushing aside a memory, but continues to be asked probing questions, the child is extremely susceptible to suggestion. This kind of contamination of evidence is precisely why what was done in these interviews should not be done. Internal coping devices and sources—even dreams and misperceptions during the event—will confuse a child's memory, especially if the child is below the age of six. Daniels opined that, when the negative response (the interviewer's irritation) was added in, there was a 99 percent chance of contamination.

Daniels specifically noted the portion of the interview in which Nicole answered a long string of questions about some cans, saying they came from Mark, they came from the store, and there were a certain number of cans in a particular location at 4:00. Nicole's apparent memory of facts did not necessarily mean she had a good memory of what actually happened. Children fill in details that may not have even a loose basis in reality. Their fabrication is not lying, but is a developmental kind of process. Daniels would not base an assumption of truth on those details, nor would she base any opinion on Nicole's memory from what she heard on the tape. In Daniels's opinion, everything here was done in a manner that was conducive to contaminating any possibility of memory and implanting statements and facts and training Nicole in how to say them. Additionally, every time Nicole got close to what might have been the truth—whatever that was—there were negative tones of voice and negative responses, and a turning away. In short, Daniels concluded that this was an "indefensible" interview.

Daniels also reviewed Nicole's trial testimony.[31] Again, she found no evidence that Nicole was actually remembering. The transcript contained no indication of reconstructing, recreating, or reliving context. Moreover, the interviews had already contaminated the child's history, memory, and speaking. In Daniels's opinion, Nicole seemed like a very unreliable witness. As with the interviews, Daniels found in Nicole's trial testimony indications of "a tremendous amount of possible contamination of her memory, and possible contamination that would affect the credibility of her speaking and testifying in trial. [¶] . . . [¶] . . . We're not talking about one or two instances. We're talking about nearly every page. We're talking about many things that were wrong. We're talking about things that would not be condoned. And, you know, that's—it's the sum of all of that, the overall picture." Moreover, there was a lot of confusion, even in terms of the photographs of petitioner and

---

[31] At the time she testified, Nicole was approximately a week shy of her fifth birthday.

Mark Dare, and, again, no sign of remembering. Although Nicole did identify a photograph of petitioner as the person who put the fire on her mommy, Daniels found "no credibility in that statement for the reason of those interviews."[32]

Petitioner also testified at the hearing. Although his testimony centered on his desire to testify during the guilt phase of trial, he denied having anything to do with Julie Wilson's murder. He also averred that Lester Williams was "a lying dope fiend heroin addict" who "would sell his own mother to the Iraqis for 50 bucks." According to petitioner, Williams was lying when he said petitioner killed Julie Wilson, who was petitioner's friend. Petitioner believed Williams lied so he could "cut[] a deal to walk from a 25-to-life."

With respect to his surreptitiously recorded conversation with Williams, petitioner explained that Cody Woods had told him that Williams was saying petitioner had committed the murder and was going to testify against him. Petitioner knew Williams was lying, so, when Woods placed them in the police van together and left them alone for a short time, he asked Williams why he lied like that. Petitioner explained that he knew he had to "play a game" with someone who was "scandalous" like Williams, and that he had to lie to him. That was why petitioner lied and said he had been at a party on the night of the murder, because he knew Williams was going to try to implicate petitioner to save himself.

At the conclusion of the hearing, counsel for petitioner argued, in pertinent part, that the undisclosed, surreptitious recording of petitioner's conversation with Lester Williams was material, for purposes of *Brady*, because petitioner's statements were entirely exculpatory, and the tape was reliable, credible evidence precisely because it was surreptitiously recorded. Counsel pointed out that Williams's statements were also exculpatory, and that he admitted he lied to police. With respect to the impeachment at trial of Williams's testimony, counsel noted that, in his closing remarks, Cline asked the jury to believe Williams, and there was a reasonable probability jurors did so. Counsel argued that the undisclosed tapes, coupled with the fact Nicole told Cline and John Johnson there was no Black man present, gave rise at least to an increased probability of a better outcome.

As for Nicole's identification of her mother's killer, counsel argued that the most reliable identification was the one she made right after the event, i.e., of "Brian's daddy." Had a jury heard the undisclosed tapes and what Daniels or any other expert could have testified to, there was a reasonable possibility at

---

[32] In assessing the credibility of Nicole's testimony, Daniels did not consider various other witnesses' statements.

least one juror could have believed Nicole identified petitioner's photograph in court because of how Cline interviewed her, so that the identification in court was not the product of Nicole's memory of the murder a year and a half earlier, but her memory of what occurred March 3. The tapes also would have bolstered the defense theory that Nicole had been manipulated.

The prosecutor responded that the surreptitious recording would have "severely damaged" petitioner's alibi defense that placed him at home all night with his family. Moreover, that alibi was destroyed by the officer who saw him at the 7-Eleven; Nikki Florez, who identified his tattoo; and Janet Turner and Kim Wallace, who placed him at the apartment complex on the evening Julie Wilson was killed. The prosecutor argued that petitioner had presented nothing to impeach any statement by any of those people, whom the jury found more believable than petitioner's alibi witnesses.

The prosecutor conceded that Williams was an unbelievable witness. He argued, however, that Williams's testimony was corroborated by other individuals at various points. He further asserted that the April 7 tape of Nicole contained "a very chilling rendition of what occurred." The prosecutor argued Nicole did not just adopt anything that was stated by the interviewer, as evidenced by her statement that she did not see a Black man there. Instead, she gave valid and credible details, and "it was clear from her responses she was remembering what happened." The prosecutor argued it was clear, from the testimony of James Simental and Lena Wilson, that Nicole identified petitioner at an early point as the person who burned her mother.

The trial court incorporated all of its original order into its second ruling. In addition, it disagreed with the notion that Nicole was not competent to testify. The court found no evidence that would lead it to believe Nicole was incapable of expressing herself or of understanding her duty to tell the truth at the time she testified. It further disagreed with the argument that the trial was fundamentally unfair because petitioner was unable to present evidence of Nicole's undisclosed statements to impeach and cross-examine her, or expert testimony regarding the reliability of her trial testimony. The court found that while the tape recordings of March 3 and April 7, 1986, reflected an initial reluctance and unwillingness to respond to questions about events surrounding the murder of Nicole's mother, Nicole eventually did so. "[O]nce engaged," she then provided details about the event that were corroborated by other witnesses and by physical evidence. The court found that, had trial counsel presented evidence from portions of those statements to impeach Nicole's trial testimony, the totality of the statements, which would have been admissible under Evidence Code section 356, would have shown knowledge and recall of the events surrounding the death. Additionally, they would have been corroborated by some of the testimony of other witnesses who placed

petitioner at the murder scene on the evening Julie Wilson was killed. From this, the court concluded that, rather than impeaching Nicole, it was "highly probable" the statements would have further bolstered her testimony, thereby further incriminating petitioner. Accordingly, the court again denied the petition.

### D. *The Present Proceedings*

The amended petition for writ of habeas corpus filed in this court in the present proceeding essentially reiterates the allegations made in the trial court. Petitioner expressly incorporates by reference the exhibits and facts presented therein, as well as those presented at the hearing in the trial court. In pertinent part, he contends that he was deprived of due process and a fair trial by the prosecution's suppression of material evidence that was favorable to the defense, to wit, the March 3, 1986, and April 7, 1986, tape recordings of Nicole Wilson; the December 1, 1984, tape recording of Lester Williams; and the December 14, 1984, surreptitiously made tape recording of Lester Williams and petitioner. Respondent answers, again in pertinent part, that petitioner's claim is procedurally barred because it is untimely, in that petitioner's counsel was appointed on November 24, 1998; was given the tapes of Nicole and Lester Williams on September 8, 2000; and yet waited until July 10, 2003, before filing a claim related to those tapes. Respondent further contends that the claim lacks merit, reasoning that there was no *Brady* violation because there is no reasonable probability the allegedly suppressed audiotapes would have produced a more favorable result for petitioner.[33]

### DISCUSSION

As previously stated, petitioner's primary claim is that he was denied a fair trial by the prosecution's failure to disclose the March 3, 1986, and April 7, 1986, tape recordings of Nicole Wilson, the December 1, 1984, tape recording of Lester Williams, and the December 14, 1984, surreptitiously made tape recording of Lester Williams and petitioner. Respondent raises two main procedural bars, contending the proceedings should be dismissed as moot due to petitioner's death during pendency of the action, and issues with respect to

---

[33] Along with exhibits setting forth the chronological history of the proceedings involving petitioner, as well as the April 12, 2004, declaration of Phillip Cline and the April 5, 2004, declaration of John Johnson, both of which were submitted to the trial court, respondent has submitted to us what purports to be a California Department of Justice printout of petitioner's criminal history. We are not sure of the purpose of this exhibit, which, in our view, merely shows that petitioner apparently had a drug and alcohol problem of some duration prior to his arrest for Julie Wilson's murder. (We are also not sure of the exhibit's accuracy, since it reflects a 2004 Visalia arrest for disorderly conduct/solicitation of a lewd act (§ 647, subd. (a)).)

the tape recordings are untimely. We will address these contentions before turning to the merits of petitioner's claim.

## I

## THE PROCEEDINGS ARE NOT BARRED AS MOOT

In order to satisfy jurisdictional requirements under California law, an individual must be in actual or constructive state custody at the time he or she files a petition for writ of habeas corpus. (§ 1473, subd. (a); *In re Azurin* (2001) 87 Cal.App.4th 20, 23–25 [104 Cal.Rptr.2d 284]; see *Mendez v. Superior Court* (2001) 87 Cal.App.4th 791, 796 [104 Cal.Rptr.2d 839].) As petitioner was imprisoned at all pertinent times, up to and including our issuance of the order to show cause in this matter, he fulfilled the requirements. Accordingly, his death did not divest this court of jurisdiction. We must determine, however, whether his death rendered the instant proceeding moot.

"It is settled that 'the duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it. It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal. [Citations.]' [Citation.]" (*Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132 [41 Cal.Rptr. 468, 396 P.2d 924]; see also *People v. Dail* (1943) 22 Cal.2d 642, 659 [140 P.2d 828] [criminal proceedings permanently abated by reason of defendant's death pending appeal]; *People v. de St. Maurice* (1913) 166 Cal. 201, 202 [135 P. 952] [same].) Similarly, where a habeas corpus petitioner dies during the pendency of proceedings, the issues technically are rendered moot and the proceedings are subject to dismissal. (*In re Jackson* (1985) 39 Cal.3d 464, 468, fn. 3 [216 Cal.Rptr. 760, 703 P.2d 100] [People's appeal from grant of writ of habeas corpus]; *In re Kay* (1970) 1 Cal.3d 930, 934, fn. 1 [83 Cal.Rptr. 686, 464 P.2d 142] [writ petn. within court's original jurisdiction].)

Even under such circumstances, however, a court retains discretion to apply an exception to the rules regarding mootness. (See *In re Jackson, supra,* 39 Cal.3d at p. 468, fn. 3.) Thus, "[w]here questions of general public concern are involved, particularly in the area of the supervision of the administration of criminal justice, we may reject mootness as a bar to a

decision on the merits. [Citations.]" (*In re Walters* (1975) 15 Cal.3d 738, 744 [126 Cal.Rptr. 239, 543 P.2d 607]; see also *In re Newbern* (1961) 55 Cal.2d 500, 505 [11 Cal.Rptr. 547, 360 P.2d 43].) "Review of a moot issue is appropriate where it is 'of great public import and transcend[s] the concerns of these particular parties.' [Citation.] Even when moot, a novel question of continuing public interest is often deserving of consideration by an appellate court. [Citations.]" (*In re Stevens* (2004) 119 Cal.App.4th 1228, 1232 [15 Cal.Rptr.3d 168]; see *In re William M.* (1970) 3 Cal.3d 16, 23–24 [89 Cal.Rptr. 33, 473 P.2d 737].)

Such is the situation before us. A man spent 20 years behind bars and, but for his untimely demise, would be there still. He may or may not have committed the crimes for which he was imprisoned, but, as we shall explain, he most certainly did not receive a fair trial. He was denied this right most fundamental to our justice system not by the good faith, unintentional and unblameworthy mistake of a witness, but because those whose duty it was to see justice done neglected or ignored that duty. This strikes at the very integrity of our system, and is an issue of such far-reaching public concern that petitioner's death cannot be allowed to render it beyond our reach. Accordingly, we deny respondent's motion to dismiss (see *In re Stevens, supra*, 119 Cal.App.4th at p. 1233), and choose to address the issue of broad public interest, i.e., nondisclosure of the four tape recordings.[34]

In so doing, we emphasize that our primary concern is not an individual named Mark Collin Sodersten. If it were, his death would be the end of this case, because we can do nothing for him personally: Although we recognize his family's interest in clearing his name (see, e.g., *People v. Succop* (1967) 67 Cal.2d 785, 790 [63 Cal.Rptr. 569, 433 P.2d 473]; *People v. Delong* (2002) 101 Cal.App.4th 482, 484 [124 Cal.Rptr.2d 293]), he is dead, and any action on our part comes far too late to benefit him.

Our concern, rather, is the integrity of our judicial system. That system was devised by, and is dependent upon, human beings. Hence, we understand and accept that it is not perfect; mistakes occur. This is a price we, as a society, accept as being an unavoidable corollary of the type of system we have. Honest mistakes do not undermine the integrity of the system. For instance, when the wrong person is convicted because an eyewitness makes a good faith, albeit incorrect, identification of him or her as the perpetrator, the system has failed, but its fundamental integrity has not been compromised. The same result obtains when 12 people conclude the prosecution has not

---

[34] Issues not addressed in this opinion are deemed moot. (See *People v. McCoy* (1992) 9 Cal.App.4th 1578, 1581, fn. 3 [12 Cal.Rptr.2d 476].)

proved its case beyond a reasonable doubt, and a guilty person goes free.[35] Here, however, the system failed for a reason that is—that *must be*—unacceptable: Its integrity was compromised not by innocent human error, but by the conduct of the very people who are sworn to uphold the system, and who are charged with seeing that justice is done. There is a difference between a miscarriage of justice and subversion of the justice system. What happened in petitioner's case compromises the core of that system, and, because we must take whatever steps we can to guard against a recurrence in someone else's case, this matter did not become moot simply because of the fortuitous fact that petitioner did not live to see the wrong righted.

We acknowledge the effect our decision will have on real people, in the real world. Nevertheless, while the finality of judgments is an important concept, it cannot be permitted to override the necessity that a final judgment be reliable. We do not know whether petitioner killed Julie Wilson. Under our judicial system, it is not we, but the jury, who must be convinced of guilt. Where the system works as it is meant to, we defer to the jury's judgment. Thus, in affirming petitioner's convictions on appeal and denying his initial petition for writ of habeas corpus, we presupposed that all material information was disclosed to the parties and before the trial court and, subject to the rules of evidence and criminal procedure and informed tactical decisions of counsel, before the trier of fact. As we shall explain, however, petitioner has since demonstrated that, in his case, the system failed in a way that has now completely undermined our confidence in the verdict, making such deference no longer proper or appropriate. We defer to the jury's judgment *when that judgment is obtained fairly under the rules of our criminal justice system.* We do not know what the jury would have done, had the undisclosed information been presented to it. What we do know is that, because the information was not disclosed to the defense, petitioner did not receive a fair trial. Accordingly, while we recognize that deciding this case on the merits is highly unusual in light of petitioner's death, we find it to be the only suitable course of action in the extraordinary circumstances now before us.

## II

## PETITIONER'S CLAIMS CONCERNING THE TAPES ARE NOT UNTIMELY

The petition in case No. F030730 was filed in this court on May 5, 1998, and we issued an order to show cause, returnable before the Tulare County

---

[35] Of course, such a scenario arguably is proof the system works as it is meant to, as it has been said that "the law holds, that it is better that ten guilty persons escape, than that one innocent suffer." (5 Tucker's Blackstone (1803) p. 358.)

Superior Court, on July 23, 1998. Pursuant to our order, the superior court appointed Michael Cross as counsel for petitioner on or about August 19, 1998. On September 22, 1998, petitioner's motion for substitution of counsel was denied. On October 23, 1998, petitioner was granted pro se status. Petitioner's subsequent request, that Cross be reappointed, was granted on November 24, 1998. The Tulare County Board of Supervisors, which had to approve payment for counsel's services, did so on March 30, 1999. Counsel then began the process of compiling the trial attorney's file, reviewing the record, and undertaking investigation of the case. On August 8, 2000, during the course of this investigation, counsel delivered a written discovery request to the Tulare County District Attorney. As a result, on September 8, 2000, counsel received, for the first time, the March 3, 1986, and April 7, 1986, tape recordings of Nicole Wilson. At the end of September 2000, counsel's investigator went to the Visalia Police Department to view any evidence that remained there. As a result, counsel learned, for the first time, of the December 1, 1984, and December 14, 1984, tape recordings of Lester Williams. The amended petition was filed in Tulare County Superior Court on July 10, 2003.

Respondent now contends that petitioner's claims with respect to the tape recordings are barred because they are untimely. Respondent points to the lapse of time between when counsel was appointed and when he sent the discovery request to the district attorney's office, and between counsel's receipt of the tapes and filing of the amended petition. Petitioner responds that the delays were adequately explained in counsel's declarations in support of his 20 requests for extensions of time, all of which were granted by the trial court. Petitioner further notes that respondent did not raise a claim of untimeliness, with respect to the delays now asserted, in the trial court.

■ As the California Supreme Court has explained, a trial is the main process by which guilt or innocence is determined, and an appeal is the primary means of challenging the fairness of the trial. (*In re Robbins* (1998) 18 Cal.4th 770, 777 [77 Cal.Rptr.2d 153, 959 P.2d 311].) While California law recognizes that circumstances not apparent from the record on appeal may undermine the validity of a judgment and so provide a basis for collateral attack through a writ of habeas corpus, California Supreme Court cases "emphasize that habeas corpus is an extraordinary remedy that 'was not created for the purpose of defeating or embarrassing justice, but to promote it' [citation], and that the availability of the writ properly must be tempered by the necessity of giving due consideration to the interest of the public in the orderly and reasonably prompt implementation of its laws and to the important public interest in the finality of judgments. For this reason, a variety of procedural rules have been recognized that govern the proper use of the writ of habeas corpus, including a requirement that claims raised in a habeas corpus petition must be timely filed." (*Id.* at pp. 777–778, fn. omitted.)

■ The state Supreme Court has not established a time limit for the presentation of claims in a habeas corpus petition. (*In re Huddleston* (1969) 71 Cal.2d 1031, 1034 [80 Cal.Rptr. 595, 458 P.2d 507].) With respect to such petitions filed in capital cases, however, it has set specific timeframes within which a writ petition will be presumed to have been filed without substantial delay. Currently those standards afford presumptive timeliness to petitions filed within 180 days after the final due date for the filing of the appellant's reply brief on direct appeal, or within 31 months after appointment of habeas corpus counsel, whichever is later. (See Cal. Supreme Ct., Policies Regarding Cases Arising from Judgments of Death, policy 3, Std. 1-1.1 [standards governing filing of habeas corpus petitions and compensation of counsel in relation to such petitions, timeliness standards].) Despite the fact these precise standards do not apply in petitioner's case, since he was not sentenced to death, *any* party " 'seeking relief by way of a petition for relief by way of an extraordinary writ is required to move expeditiously. [Citations.]' [Citation.] '[A]ny significant delay in seeking collateral relief . . . must be fully justified. [Citations.]' [Citation.] The defendant 'must point to particular circumstances sufficient to justify substantial delay as [Supreme Court decisions] have long required.' [Citation.]" (*People v. Miller* (1992) 6 Cal.App.4th 873, 881 [8 Cal.Rptr.2d 193]; see, e.g., *In re Stankewitz* (1985) 40 Cal.3d 391, 396–397, fn. 1 [220 Cal.Rptr. 382, 708 P.2d 1260].)

■ In our view, assuming "substantial" delay existed here (which we do not decide), petitioner has met his burden of establishing good cause therefor.[36] Some of the delay, both immediately after counsel's appointment and later during his representation of petitioner, was occasioned by counsel's need to secure guaranteed funding before proceeding further. "Private appointed counsel . . . is under no obligation to fund . . . an investigation [into potential habeas corpus claims] out-of-pocket." (*In re Gallego* (1998) 18 Cal.4th 825, 833 [77 Cal.Rptr.2d 132, 959 P.2d 290].) Under the circumstances of this case, the lack of funding is a valid justification for at least some of the delay. (See *id.* at pp. 834–835.) Moreover, petitioner was not counsel's only client during the pertinent period of time. This situation was the foreseeable, virtually unavoidable result of our order directing the Tulare County Superior Court to appoint counsel experienced in capital appeals, and it would be unreasonable for us to penalize petitioner because counsel was unable to devote his efforts full time to petitioner's case. Additionally, our order implicitly contemplated, given the circumstances of petitioner's case and the nature of the evidence at trial, that counsel would undertake a broad investigation, as we directed counsel to address the circumstances relating to

---

[36] We cannot help but note that, were we to find otherwise, it would simply give petitioner (were he alive) a new claim of ineffective assistance of counsel, thereby furnishing, presumably, good cause for further delay. (See *In re Sanders* (1999) 21 Cal.4th 697, 708–709 [87 Cal.Rptr.2d 899, 981 P.2d 1038] (plur. opn. of Werdegar, J.).)

Nicole Wilson's identification of petitioner as the perpetrator "and any other issues which, after careful review of the record . . . he or she deems potentially meritorious and which have not been decided previously on appeal." (See *In re Robbins, supra,* 18 Cal.4th at p. 780 [ongoing investigation into potentially meritorious claim may establish good cause for substantial delay].)

Significantly, at every juncture, counsel asked for, and received, permission from the trial court for an extension of time in which to file the amended petition. He has presented those requests to us, and we find them sufficiently detailed and adequate to justify the trial court's acquiescence in the delay. This is not a situation in which the petitioner "sat on his rights." Furthermore, although we need not decide whether a party will always forfeit a claim of untimeliness by failing to raise it at the first opportunity, we agree with petitioner that, since the claim of untimeliness does not relate to the filing of the amended petition in this court, it should have been raised below so that the court which sanctioned the delay could address it in the first instance.

Finally, although we cannot definitively say that the nondisclosure of the tapes led to a trial so fundamentally unfair that, absent the error, *no* reasonable judge or jury would have convicted petitioner, the situation comes close. There was a substantial question whether petitioner killed Julie Wilson. (Contra, e.g., *In re Clark* (1993) 5 Cal.4th 750, 759–760 [21 Cal.Rptr.2d 509, 855 P.2d 729].) Moreover, the error was of constitutional dimension and was occasioned by the conduct—whether negligent or intentional—of those officials charged with apprehending and prosecuting the guilty person or persons. Significantly, the error carried with it grave risk of convicting an innocent person. (See *id.* at pp. 766–767.) Neither our assessment of the error nor our prejudice analysis is affected by the delay; what was unfair in 2003, when the amended petition was filed, was not somehow more fair in 2000, when counsel obtained the tapes, or in 1998, when counsel was appointed. If anything, the delay primarily worked to petitioner's own disadvantage. (See *In re Huddleston, supra,* 71 Cal.2d at p. 1034.)

We conclude that the lapse of time was not unreasonable under the present circumstances. (See *In re Huddleston, supra,* 71 Cal.2d at p. 1034.) Accordingly, we reject respondent's assertion of an untimeliness bar to the instant proceedings.

## III

## PETITIONER HAS ESTABLISHED ENTITLEMENT TO RELIEF

■ We turn now to the merits of petitioner's claim that nondisclosure of the four tape recordings violated his rights to due process and a fair trial. " 'A habeas corpus petitioner bears the burden of establishing that the judgment under which he or she is restrained is invalid. [Citation.] To do so, he or she must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus. [Citation.]' [Citation.]" (*In re Cudjo* (1999) 20 Cal.4th 673, 687 [85 Cal.Rptr.2d 436, 977 P.2d 66].) "Where, as here, the superior court has denied habeas corpus relief after an evidentiary hearing (viz., the hearing held on the order to show cause ordered in response to petitioner's first habeas corpus petition) and a new petition for habeas corpus is thereafter presented to an appellate court based upon the transcript of the evidentiary proceedings conducted in the superior court, 'the appellate court is not bound by the factual determinations [made below] but, rather, independently evaluates the evidence and makes its own factual determinations.' [Citation.]" (*In re Resendiz* (2001) 25 Cal.4th 230, 249 [105 Cal.Rptr.2d 431, 19 P.3d 1171], fn. omitted; see *In re Wright* (1978) 78 Cal.App.3d 788, 801–802 [144 Cal.Rptr. 535].) We independently review the superior court's resolution of legal issues and mixed questions of law and fact (*In re Cudjo, supra,* 20 Cal.4th at pp. 687–688; *People v. Singer* (1990) 226 Cal.App.3d 23, 32 [275 Cal.Rptr. 911]), with a *Brady* determination falling into the latter category (*In re Pratt* (1999) 69 Cal.App.4th 1294, 1314 [82 Cal.Rptr.2d 260]). Additionally, "[w]hile our review of the record is independent and 'we may reach a different conclusion on an independent examination of the evidence . . . even where the evidence is conflicting' [citation], any factual determinations made below 'are entitled to great weight . . . when supported by the record, particularly with respect to questions of or depending upon the credibility of witnesses the [superior court] heard and observed.' [Citations.] On the other hand, if 'our difference of opinion with the lower court . . . is not based on the credibility of live testimony, such deference is inappropriate.' [Citations.]" (*In re Resendiz, supra,* 25 Cal.4th at p. 249.)

We concur with the trial court's finding that the tapes in question were not disclosed to petitioner's trial counsel. It appears that court properly relied on the various declarations submitted by the parties.[37] (See *In re Fields* (1990) 51 Cal.3d 1063, 1070 & fn. 2 [275 Cal.Rptr. 384, 800 P.2d 862].) Those declarations established that, whatever the standard practice of the trial

---

[37] Even apart from the declarations, it is clear from the record that, whatever the perceived shortcomings of trial counsel, he would have attempted to use the tapes if he had had them.

prosecutor with respect to providing such tape recordings to the defense, the tapes of Nicole were never turned over. Although the record shows that trial counsel was aware Nicole had undergone at least one court-familiarization session in which she was taken to a courtroom and shown who sat where and given an explanation about what would take place, it is clear he had no idea Nicole was actually practicing her testimony and making statements to prosecutors. (See *Strickler v. Greene* (1999) 527 U.S. 263, 285 [144 L.Ed.2d 286, 119 S.Ct. 1936].) With respect to the Lester Williams tapes, even Cline and his investigator were unaware of them. Ronn Couillard, the first prosecutor in the case, was aware of the surreptitiously recorded conversation between Williams and petitioner, but not Williams's statement of December 1, 1984. There was no reason trial counsel should have suspected these tapes existed, especially since, at trial, Detective Woods (who was the primary investigating officer and who, along with Sergeant Gomes, interviewed Williams on Dec. 1, 1984) consistently testified, and represented to the court and counsel outside of the jury's presence, that the only tape-recorded interviews with Williams were Officer Salazar's interview of November 27, 1984, and the interviews conducted on November 28, 1984, by Woods, Salazar, and Gomes. This testimony was factually incorrect. Moreover, the notion that the tapes of November 27 and 28, 1984, were the only ones in existence was confirmed by Officer Salazar, who testified at trial that, to his knowledge, there were no other tapes of Lester Williams.[38]

The parties in the writ proceedings apparently never noticed the discrepancy in Woods's testimony, and so never explored whether his testimony in this regard was the result of a lapse of memory or deliberate. Given the fact that it was during the December 1 interview that officers went beyond threatening to charge Williams with murder to threatening him with the death penalty—the type of tactics this court previously has condemned as coercive (see, e.g., *People v. Hinds* (1984) 154 Cal.App.3d 222, 237–238 [201 Cal.Rptr. 104]; *People v. Flores* (1983) 144 Cal.App.3d 459, 470–472 [192 Cal.Rptr. 772])—the lapse raises extremely serious issues. The failure to disclose evidence of improper and coercive interrogation of a witness preceding a statement that is beneficial to the prosecution engenders significant questions about the credibility of the beneficial statement. A well-trained police officer would be expected to know that such conduct would be detrimental to the prosecution's case. There is no question that law enforcement and prosecutorial authorities would be fully aware of the impact a taped admission of lying about the defendant's culpability would have. Thus, we have grave concerns about why the improper interrogation, as well as the existence of a tape of the interrogation and the admission of lying, was not acknowledged in sworn testimony. Although we do not rest our decision in this case on a finding of

[38] Salazar was not present during the December 1, 1984, interview. The record contains no evidence that he was aware of its existence.

perjury, we cannot help but note that deliberate falsity "involve[s] a corruption of the truth-seeking function of the trial process." (*United States v. Agurs* (1976) 427 U.S. 97, 104 [49 L.Ed.2d 342, 96 S.Ct. 2392].) As our state Supreme Court has observed, "Perjury by law enforcement officials is particularly pernicious. Our entire criminal justice system is built around the belief, and necessity, that law enforcement officers will testify truthfully. . . . Deliberate, cynical perjury by law enforcement officials strikes at the very core of our system of law. It manipulates and thereby perverts the entire judicial process." (*People v. Beardslee* (1991) 53 Cal.3d 68, 110 [279 Cal.Rptr. 276, 806 P.2d 1311].)

■ We turn now to the effect of the prosecution's failure to disclose the four tapes. "A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused. [Citation.]" (*Youngblood v. West Virginia* (2006) 547 U.S. 867, ___ [165 L.Ed.2d 269, 126 S.Ct. 2188, 2190]; see *Brady, supra,* 373 U.S. at p. 87.) "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." (*United States v. Bagley* (1985) 473 U.S. 667, 675 [87 L.Ed.2d 481, 105 S.Ct. 3375] (*Bagley*), fns. omitted; see *In re Imbler* (1963) 60 Cal.2d 554, 567–568 [35 Cal.Rptr. 293, 387 P.2d 6].) The *Brady* duty extends to evidence that is both favorable to the accused and material either to guilt or to punishment (*Bagley, supra,* at p. 674; *Brady, supra,* at p. 87), and to impeachment evidence as well as to exculpatory evidence (*Youngblood v. West Virginia, supra,* 547 U.S. at p. ___ [126 S.Ct. at p. 2190]; *Bagley, supra,* at p. 676; see *Giglio v. United States* (1972) 405 U.S. 150, 154 [31 L.Ed.2d 104, 92 S.Ct. 763]). Because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" (*Kyles v. Whitley* (1995) 514 U.S. 419, 437 [131 L.Ed.2d 490, 115 S.Ct. 1555] (*Kyles*), "*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor' " (*Youngblood v. West Virginia, supra,* 547 U.S. at p. ___ [126 S.Ct. at p. 2190]; see *Kyles, supra,* at p. 438). Moreover, the duty to disclose exists regardless of whether there has been a request by the accused, and the suppression of evidence that is materially favorable to the accused violates due process regardless of whether it was intentional, negligent, or inadvertent. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 [29 Cal.Rptr.3d 16, 112 P.3d 14]; *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1381 [66 Cal.Rptr.2d 494]; see *Strickler v. Greene, supra,* 527 U.S. at p. 275, fn. 12; *United States v. Agurs, supra,* 427 U.S. at p. 107; *Brady, supra,* 373 U.S. at p. 87.)

 "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene, supra,* 527 U.S. at pp. 281–282.) We have already determined that the four tape recordings were suppressed, as they were known to the prosecutors or their agents and were not disclosed to trial counsel (see *id.* at p. 282); whether the nondisclosure was intentional is immaterial, and we do not decide that question.

We next turn to whether the evidence was favorable to petitioner. "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [Citation.]" (*In re Sassounian* (1995) 9 Cal.4th 535, 544 [37 Cal.Rptr.2d 446, 887 P.2d 527] (*Sassounian*); see *Bagley, supra,* 473 U.S. at p. 676.) Both sets of tapes meet this requirement. As the trial court found, suppression of the tapes deprived petitioner's trial counsel of several opportunities to attack the credibility of two very important prosecution witnesses. Our independent review of the record leads us to conclude that such an attack likely would have been devastating to the prosecution's case.[39]

 We thus reach the main issue in this case, and the one on which we part company with the trial court: whether the undisclosed evidence was material. In this respect, "[m]ateriality . . . requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]" (*People v. Salazar, supra,* 35 Cal.4th at p. 1043.) Thus, "[e]vidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.] Further, it is a probability that is, as it were, 'objective,' based on an 'assumption that the decisionmaker is reasonably,

---

[39] That portions of the tapes may have been inculpatory, or at least unfavorable to petitioner, does not mean there was no *Brady* violation. As the United States Supreme Court has made clear, "*Brady*'s disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness. [Citation.]" (*Strickler v. Greene, supra,* 527 U.S. at p. 282, fn. 21.)

conscientiously, and impartially applying the standards that govern the decision,' and not dependent on the 'idiosyncrasies of the particular decision-maker,' including the 'possibility of arbitrariness, whimsy, caprice, "nullification," and the like.' [Citation.]" (*Sassounian, supra,* 9 Cal.4th at pp. 544–545, fn. omitted; see *Bagley, supra,* 473 U.S. at pp. 678, 682 (lead opn. of Blackmun, J.); *id.* at p. 685 (conc. opn. of White, J.); cf. *Strickland v. Washington* (1984) 466 U.S. 668, 694–695 [80 L.Ed.2d 674, 104 S.Ct. 2052] [dealing with ineffective assistance of counsel in violation of 6th Amend.].)

The United States Supreme Court has observed:

"Four aspects of materiality under *Bagley* bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [Citations.] *Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' [Citation.]

"The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

"Third, . . . , once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review. Assuming, *arguendo,* that a harmless-error enquiry were to apply, a *Bagley* error could not be treated as harmless, since 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' [citations], necessarily entails the conclusion that the suppression must have had ' "substantial and injurious effect or influence in determining the jury's verdict," ' [citation]. . . . In sum, once there has been *Bagley* error . . . , it cannot subsequently be found harmless . . . .

"The fourth and final aspect of *Bagley* materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item." (*Kyles, supra,* 514 U.S. at pp. 434–436, fns. omitted.)

With regard to the third aspect, the California Supreme Court has elucidated: "A showing by the prisoner of the favorableness and materiality of any evidence not disclosed by the prosecution necessarily establishes at one stroke what in other contexts are separately considered under the rubrics of 'error' and 'prejudice.' For, here, there is no 'error' unless there is also 'prejudice.' [Citations.] [¶] It follows that harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], with its standard of 'harmless beyond a reasonable doubt,' is not implicated. If the prisoner fails to show both the favorableness and the materiality of the evidence not disclosed by the prosecution, his custodian *need not* make any attempt to demonstrate that the prosecutorial nondisclosure was harmless beyond a reasonable doubt. Obviously, in such a situation, there is no 'error' to be found harmless. But if the prisoner succeeds, his custodian *cannot* make any attempt of this kind. Under such circumstances, there is an 'error' that is necessarily 'prejudicial.' That is because if the prisoner establishes 'a reasonable probability that, had the evidence been disclosed to the defense, the result . . . would have been different' [citations], that is to say, if he establishes a probability sufficient to 'undermine[] confidence in the outcome' [citations], as a matter of necessity he establishes the prosecutorial nondisclosure was *not* harmless beyond a reasonable doubt." (*Sassounian, supra,* 9 Cal.4th at pp. 545–546, fn. 7.)

Having undertaken "the cumulative evaluation required by *Bagley*" (*Kyles, supra,* 514 U.S. at p. 441), we conclude that, "[i]n this case, disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." (*Ibid.*) As we previously have noted, there was no physical evidence that directly linked petitioner to Julie Wilson's murder. Instead, the prosecution's case depended almost entirely on the testimony of eyewitnesses, most notably Nicole Wilson and Lester Williams. Although other witnesses placed petitioner at or around Julie's residence before and after the body was discovered, contrary to his alibi evidence, only Lester Williams and Nicole identified him as Julie's attacker and killer, respectively. Simply put, their testimony was the heart of the prosecution's case. Any evidence that would have had a significantly negative effect on how the jury evaluated their testimony, therefore, necessarily would have substantially undercut the case against petitioner. In Nicole's case, the existence of tapes that disclosed uncertainty in the identification and raised questions about influencing the identification with respect to the photographs would have had the potential of seriously undermining the veracity of the photographic

identification she made in court. Failure to disclose the existence of the tapes directly affected the ability of the defense to test one of the prosecution's two principal witnesses.

We do not believe disclosure of the tapes of Nicole would have required the trial court, as a matter of law, to find her incompetent to testify at trial. Dr. Daniels's testimony, based on her review of the tapes, raised intriguing and significant questions concerning the ability of a child Nicole's age to understand, and adhere to, the concept of telling the truth. Nevertheless, the California Supreme Court has rejected a challenge to the competency of a witness only slightly older than Nicole was at the time of trial, on much the same voir dire as that to which Nicole was subjected, and upon receipt of much the same answers as Nicole gave. (See *People v. Mincey* (1992) 2 Cal.4th 408, 443–445 [6 Cal.Rptr.2d 822, 827 P.2d 388] [witness was five years old at time of trial].) In finding that the trial court did not abuse its discretion in ruling that the witness, Wendy, was competent to testify, the high court observed: "We have reviewed Wendy's brief testimony. Some of her statements were inconsistent. On cross-examination, defense counsel challenged those inconsistencies and Wendy's inability to recall some of the details of what had occurred the night of James's death. Inconsistencies in testimony and a failure to remember aspects of the subject of the testimony, however, do not disqualify a witness. [Citation.] They present questions of credibility for resolution by the trier of fact. [Citations.]" (*Id.* at pp. 444–445.)

The materiality of the undisclosed tapes of Nicole lies primarily in the fact that they would have given the jury a totally different picture of her as a witness. In this regard, we find it particularly significant that the prosecutor did not seek to have Nicole identify petitioner in court, but instead relied entirely on her identification of petitioner's photograph. The obvious rationale for such a tactic was concern about Nicole's ability to make a strong in-court identification. Yet, her testimony at trial gave the impression that she was very clear on who the different Marks were, and with respect to which one killed her mother. Her identification of petitioner's photograph came across as being very solid, so much so that jurors could have easily dismissed her earlier identifications of Mark Dare as being the result of confusion caused by the trauma of seeing her mother killed. In short, she presented as a very good witness for a child her age. On the tapes, however, she came across as frequently playful; at times, almost flighty. Her differentiation between the two Marks was nowhere near as definite as in her trial testimony, and a jury "would reasonably have been troubled" by her question to Cline, during the March 3, 1986, interview, "Did that one kill my mommy?"[40] (See *Kyles, supra,* 514 U.S. at p. 443.) Moreover, the tapes showed a rehearsal of

---

[40] This question would have given added significance to the opinion of James Simental, Nicole's father, that Nicole was confused when identifying photographs of petitioner and Mark

Nicole's identification of petitioner's photograph. Jurors hearing these tapes reasonably would have wondered whether Nicole, in her trial testimony, was identifying a photograph of the man who actually killed her mother, or the photograph she had been conditioned by the interviews to choose.

Although Nicole seemed to recall more details in the interviews (especially that of April 7, 1986) than she did at trial, some of the details appear to have been elicited by the interviewers' technique of leading her answers. For instance, when Nicole answered affirmatively to the question whether "Mark" lit a match to start the fire on her mommy, she was immediately asked, "Or a cigarette lighter?" and changed her answer. Similarly, when Nicole answered "[by] my mommy" when asked where the papers were, she was immediately asked, "Were they by your mommy, or on your mommy?" When Nicole said the papers were on her mommy's head, Cline responded, "They were?" in a tone of voice that suggested surprise or even scoffing at her response. These and other similar exchanges would have bolstered the defense contention that she had been coached.[41] (See *Kyles, supra,* 514 U.S. at pp. 443–444, fn. 14.) In addition, the tapes contain references to at least one other session with Nicole, thus raising further questions concerning whether Nicole's apparent memory on April 7 was truly of events she witnessed and actually recalled, or whether those details were the result of interview techniques used at times a tape recorder was not running. As the United States Supreme Court has recognized, "the evolution over time of a given eyewitness's description can be fatal to its reliability . . . ." (*Id.* at p. 444.)

Most importantly, even in 1986, the undisclosed tape recordings would have provided an abundant basis for testimony of an expert, such as Dr. Daniels, concerning the impact of interview techniques on the testimony and reliability of a child Nicole's age. The likely impact of such evidence on the jury's assessment of Nicole's testimony cannot be underestimated, especially in light of the fact that Nicole originally identified Mark Dare as the killer when interviewed by Officer Marvin, who employed a much different

Dare during the interview in Ronn Couillard's office, and that Simental felt Nicole was under pressure to identify petitioner's picture (although he backed off from his original assertion that Couillard pressured her).

[41] Whether the entirety of the tapes themselves would have been admissible into evidence need not be determined; if not, the defense could have presented much of the information through testimony of the district attorney's investigator, who was present during the interviews and even conducted portions of them. At least some excerpts of the tapes would have been admissible for specific impeachment purposes and, for example, to demonstrate changes in voice tone and the like. Even admission of the tapes in their entirety would have benefited petitioner: While Nicole's apparently superior memory would have bolstered the conclusion she was competent to testify and did indeed witness her mother's murder, it would not have detracted from an argument that she had been coached or, more importantly, that her identification of Mark Dare as the perpetrator was more reliable than her identification of petitioner.

interview technique. This is true even though it appears Nicole began to distinguish between a "good Mark" and a "bad Mark" before she was interviewed by Couillard.

That both parties viewed Nicole's testimony as being of major importance was obvious as early as voir dire, when they questioned prospective jurors concerning their views of a child's testimony and whether children lie. Generally, the prospective jurors seemed to feel that a child's testimony should be evaluated in the same way as that of an adult, and some prospective jurors expressed the opinion that children tend to be more truthful. One prospective juror commented that a few children of the age in question would lie, but that most of them would come out with the truth, especially under pressure. Another asked whether "something like this" would cause a child to feel pressured. The trial court responded: "Well, that may be something that you have to decide in this case if the child does testify is whether pressure by one party or by the attorneys or by anybody that's interrogated her before this matter came to court affected truth as she perceives it. [¶] . . . [¶] You are going to have to hear what she has to say and consider all the surrounding evidence and all the surrounding circumstances [*sic*] under which she made these observations in deciding whether it's truthful or not. [¶] Obviously you have this problem with every witness. There are some people that—whose perceptions of reality are affected by things other people tell them and then sometimes they aren't. But that's something you're going to have to decide from all the surrounding circumstances, obviously, is whether anything has been suggested to her. Whether it's not. Whether that—if there was a suggestion, whether that affected the reality of her perception or whether it did not. [¶] So this is something that has to be decided from all the evidence that's presented here in this courtroom as to whether you're going to believe it or not and the law doesn't give you any fixed magic rule to do that. [¶] It just tells you bring in your common sense and apply all these factors." Thus, the trial court recognized the potential problem; however, without the tapes of the interview sessions with Nicole, there was no real evidence upon which the defense could base its claim that pressure and coaching tainted Nicole's testimony. Moreover, expert testimony based on the tapes could have explained to jurors that a child's testimony often presents unique problems that are *not* necessarily found with adult witnesses, and to disabuse them of the notion that placing pressure on the child would increase the likelihood of receiving a truthful answer.

We recognize that Daniels did not interview Nicole, nor did she observe her testimony as jurors did. As we have pointed out, however, the impression Nicole gave during the undisclosed interviews was markedly different from the one she gave at trial. Thus, jurors' observations of her courtroom behavior and demeanor did not tell the whole story with respect to her reliability.

Perhaps jurors could have decided that the differences occurred because Nicole was intimidated by the courtroom setting. Because the tapes were suppressed, however, the parties were unable to explore, and jurors to evaluate, the issue. Moreover, had the defense been aware of the tapes and their contents, it is highly likely Daniels or some other expert would have interviewed Nicole and/or observed her testimony. The undisclosed tapes of the March 3, 1986, and April 7, 1986, interviews with Nicole were material under *Brady*.

The undisclosed tapes of Lester Williams were also material for *Brady* purposes. Jurors knew that Williams initially denied any knowledge of events or involvement, then, after being informed he was a suspect and that petitioner was "pointing the finger" at him, implicated petitioner. What they did not know, however, was that subsequently, despite being threatened with execution, Williams had maintained he was too high to remember anything. This is significant not only because of Williams's asserted lack of memory (which reasonable jurors likely would have found unbelievable in light of his knowledge of details that were consistent with the physical evidence), but because Williams claimed to have been "loaded," "really fucked up," smoking "some of that PC that Sherman," smoking "a lot of Sherman that night," and that he had "been on [that] shit for awhile." In his other statements to police, as well as his preliminary hearing testimony and testimony at trial, Williams had said he was fairly high, but from drinking.

At the time police questioned Williams, "Sherman" was a common street name for PCP-laced cigarettes. (See, e.g., *People v. Presley* (1985) 172 Cal.App.3d 1001, 1003 [220 Cal.Rptr. 1]; *People v. Crenshaw* (1984) 161 Cal.App.3d 702, 703 [207 Cal.Rptr. 779].) The possibility Williams was on PCP the night of the murder would likely have substantially changed how jurors evaluated his ability to perceive and remember, an important factor in light of his own admission that he had been coached by the prosecutor's investigators a number of times. It also might well have affected jurors' assessment of Williams's potential involvement in the crime and the lengths to which he may have been willing to go—including perjuring himself and framing an innocent man—in order to secure dismissal of the murder charge against himself.[42]

---

[42] Under section 1473, a petitioner may seek habeas corpus relief on the ground, inter alia, that "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against [him] at any hearing or trial relating to his incarceration . . . ." (§ 1473, subd. (b)(1).) "False evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that '*with reasonable probability* it *could have* affected the outcome . . . .' [Citation.] In other words, false evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. [Citation.] The requisite 'reasonable probability,' . . . is such as undermines the reviewing court's confidence in the outcome. [Citation.] It is

More important is the fact that jurors did not know Williams had admitted to petitioner that he lied to police when he said petitioner was involved. Although Williams's credibility was impeached at trial and he was caught in a number of lies, none had the potential effect on his credibility of an admission that he lied when he told the police that petitioner was the perpetrator.

Apparently preferring potential *Massiah*[43] error to an actual *Brady* violation, respondent asserts that the surreptitiously recorded conversation appears to involve Williams acting on behalf of law enforcement in an attempt to procure an incriminating statement from petitioner. Accordingly, the argument runs, Williams's statements that he lied about petitioner's involvement are meaningless. It is conceivable respondent could be correct. Since the tape was never disclosed, however, the parties never had the opportunity to explore

---

dependent on the totality of the relevant circumstances. [Citation.] It is also . . . determined objectively. [Citation.] [¶] Thus, to merit relief on this basis, the prisoner must show that any false evidence introduced against him was substantially material or probative, as defined above. [Citations.]" (*Sassounian, supra,* 9 Cal.4th at p. 546.)

While we do not base our finding of materiality on the possibility the undisclosed information could have led trial counsel to conduct further investigation that may have led to additional evidence (see *Wood v. Bartholomew* (1995) 516 U.S. 1, 5–6 [133 L.Ed.2d 1, 116 S.Ct. 7]), we cannot help but wonder where evidence of PCP use by Williams might have led. Explosive violence can be associated with PCP use. (See, e.g., *In re Brown* (1998) 17 Cal.4th 873, 888 [72 Cal.Rptr.2d 698, 952 P.2d 715]; *People v. Montiel* (1993) 5 Cal.4th 877, 901 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *In re Sixto* (1989) 48 Cal.3d 1247, 1262 [259 Cal.Rptr. 491, 774 P.2d 164].) The record contains some suggestion that authorities may have felt, given the brutality of the crime, that the murderer was on PCP. The prosecutor himself argued to the jury that the murder was committed by someone in a rage, who could not control his violence. There was no suggestion petitioner used PCP on the night in question. Intriguingly, David Green, who reportedly knew significant details about the murder and ultimately confessed to a friend that he was the killer, and who purportedly bore a striking resemblance to petitioner, allegedly stated that he and some Black man were at Julie's residence on the day of her death, along with another White male. The Black man "smoked P.C.P. until he was out of his mind." Green allegedly further related that the men he was with both lived in the same apartment complex, and that, while he kept company with petitioner, he was not referring to the day of Julie's death. According to Green, the Black man eventually was left alone with Julie. We reiterate, however, that this speculation does not in any way form the basis for our finding of materiality. (See *Wood v. Bartholomew, supra,* 516 U.S. at p. 6.)

[43] *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. As the California Supreme Court explained in *People v. Slayton* (2001) 26 Cal.4th 1076, 1079 [112 Cal.Rptr.2d 561, 32 P.3d 1073], "The Sixth Amendment to the United States Constitution . . . provides in part that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense.' This right to counsel attaches ' "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' [Citation.] After it both attaches and is invoked, any incriminating statement the government deliberately elicits from a defendant in counsel's absence is inadmissible at that defendant's trial. [Citations.]" The record here is not clear enough for us to determine whether petitioner's right to counsel had attached and been invoked at the time of the conversation.

that possibility. Either Williams lied to the police or he was attempting to dupe petitioner, either to curry favor with law enforcement or at their behest. Regardless of the true circumstances, Williams's credibility would have been severely impacted. Moreover, if Williams was acting at police behest, this kind of official trickery—even if not rising to the level of a Sixth Amendment violation—would not have placed the police or the quality of their investigation in a good light, and would have bolstered the defense's attack on the thoroughness and even the good faith of that investigation.[44] (See *Kyles, supra,* 514 U.S. at p. 445.)

We recognize that the bulk of petitioner's statements in the December 14 conversation are self-serving hearsay, and so would not have been admissible for their truth. (See *People v. Kaurish* (1990) 52 Cal.3d 648, 704–705 [276 Cal.Rptr. 788, 802 P.2d 278].) We further recognize that, if the whole of the conversation were admitted pursuant to Evidence Code section 356,[45] petitioner's assertion that he was at a party on the night of the murder would have undercut the alibi evidence he presented at trial. Petitioner could have testified at trial to explain the discrepancy, however, as he did at the writ hearing (in fact, the record suggests petitioner wanted to take the witness stand at trial), or he could have chosen a different avenue of defense.

The impeachment value of the undisclosed Lester Williams statements went far beyond the level of impeachment to which Williams's testimony was subjected at trial. (Cf. *People v. Dickey* (2005) 35 Cal.4th 884, 908 [28 Cal.Rptr.3d 647, 111 P.3d 921] [information would have been favorable to defendant as tending to impeach witness's credibility, but was not material because it would have added little to cumulative impact of other impeachment evidence].) Under *Brady,* petitioner was required to establish that he was deprived of evidence that could have undermined the credibility of Williams's assertion that petitioner was the perpetrator. (See *In re Pratt, supra,* 69 Cal.App.4th at p. 1315.) We find he did so here.

A cumulative evaluation of the undisclosed evidence bolsters our determination that the suppressed tapes of Nicole and Williams were material under *Brady.* In this regard, "the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether

---

[44] For instance, the defense raised significant questions about the thoroughness with which the police investigated Mark Dare's alibi and the examination and testing of certain potential physical evidence. In addition, Detective Woods told Williams, during the undisclosed interrogation of December 1, 1984, that they were trying to "get" petitioner.

[45] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

we can be confident that the jury's verdict would have been the same." (*Kyles*, *supra*, 514 U.S. at p. 453.) We do not have such confidence here.

The prosecutor argued to the jury that there were three separate and independent sources that established petitioner was Julie Wilson's killer: Nicole Wilson, Lester Williams, and Nikki Florez.[46] However, Nikki Florez and the other witnesses who put petitioner in the area or inside Julie Wilson's apartment at some point earlier on the evening of the murder could only cast suspicion on petitioner. Their testimony could not, and did not, establish his guilt. That required the testimony of Nicole and Lester Williams. Each of their identifications of petitioner, standing alone, was open to significant impeachment, and each depended on the other's testimony, and on the testimony of Nikki Florez and the other witnesses, to overcome the problems inherent in their testimony. Yet, most of the other witnesses were also subject to some measure of impeachment.[47] In short, the prosecution's case was a trail of dominoes. Once one fell, it took the others down with it. As Nicole and Lester Williams were the two pillars of the prosecution's case, and given the nature and quality of the suppressed tapes, there is a reasonable probability that disclosure of those tapes would have brought the entire case tumbling down.

## CONCLUSION

Our review of the record in this case raises fundamental questions about the process used to convict Mark Sodersten. The trier of fact was asked to make a determination of guilt based on evidence that was incomplete because

---

[46] The prosecutor attributed Nicole's initial identification of Mark Dare to being shown only one photograph by Officer Marvin, and suggested Nicole "probably couldn't" fabricate. In his opening statement, he described Williams as "a major witness in this case," and he asserted that, once Williams told police what happened during the November 28, 1984, interrogation, he "remained almost completely consistent from that point on." With respect to Nikki Florez, the prosecutor argued that she had told police, early in the investigation, that petitioner had been at Julie Wilson's apartment early on the evening of the murder. He attributed her failure to report petitioner's threat and conduct until trial to the fact that she was told, according to Kim Wallace, not to talk about the case, and she had gone to Nevada.

[47] For instance, Nikki Florez testified that she talked to Phillip Cline about her testimony on two or three occasions. There was some suggestion he may have shown her photographs of petitioner's tattoos, although Nikki testified at trial that this did not occur. She also testified to having told at least one police officer about petitioner's threat to kill Julie, yet no police report could be found that contained any reference to such a threat.

At oral argument, respondent pointed to Officer Frame's testimony that he saw petitioner buying Schaefer beer on November 1. Interestingly, Frame testified that petitioner was in the company of a *White* man, not a Black man (inferably Lester Williams), as found by the trial court in its first order denying the writ petition. Respondent also noted that Camel cigarette butts were found in Julie Wilson's apartment and in petitioner's vehicle. Laurie Thatcher testified, however, that Mark Dare also smoked that brand.

of the state's failure to disclose exculpatory evidence. This is not simple error in which the balance of the evidence can be evaluated and found to support no other reasonable conclusion but that reached by the jury. The foreclosed evidence in this case strikes directly at the issue of guilt or innocence. This is also not a case where the evidence of guilt is such that, while the issue of a fair trial is called into question, the issue of factual innocence is not. Moreover, the prosecution here asked for the penalty of death. Only the verdict of a jury deprived of exculpatory evidence fortuitously avoided that outcome. This case raises the one issue that is the most feared aspect of our system—that an innocent man might be convicted. While that consequence unfortunately does occur in the most protective justice system ever devised by man, it cannot be allowed to occur as a result of a dereliction of their duty by law enforcement and prosecutorial authorities sworn to protect that system. And, it should not be cloaked in silence if scrutiny by the justice system is to stand as a reminder of that duty.

We do not know—and need not determine—whether petitioner killed Julie Wilson. It is not his burden to establish either that he is factually innocent or that the jury necessarily would have acquitted him had it known of the suppressed evidence. (See *Kyles*, *supra*, 514 U.S. at p. 453.) "Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation.]" (*Strickler v. Greene*, *supra*, 527 U.S. at p. 290.) Petitioner has carried his burden. Nicole and Lester Williams were of paramount importance to the prosecution's case, and the outcome of trial depended to a very large extent on their credibility and the reliability of their testimony. (See *People v. Kasim*, *supra*, 56 Cal.App.4th at p. 1382.) We do know that if petitioner were alive, he would be entitled to a new trial to determine if the presumption of innocence would prevail in the face of *all* the evidence, including that which was not disclosed. We also know that if petitioner did not commit this most horrible murder, then someone else did who remains free of the consequences of his crime.

 In sum, we conclude that, had the four tape recordings been disclosed to the defense, there is a reasonable probability of a different result. Because of the nature and quality of the exculpatory evidence that was suppressed here, "the factual underpinnings upon which the jury relied to make its critical decisions were seriously eroded" (*People v. Kasim, supra*, 56 Cal.App.4th at p. 1382), and petitioner was denied a fair trial.

## DISPOSITION

The petition for writ of habeas corpus is granted. The judgment in Tulare County Superior Court case No. 22976 is vacated. This court having received

and filed a certified copy of a certificate evidencing the death of petitioner Mark Collin Sodersten during the pendency of these proceedings, the superior court is directed to enter an order to the effect that all proceedings in the cause have permanently abated. (See *People v. Jackson, supra*, 39 Cal.3d at p. 480.)

Cornell, J., and Kane, J., concurred.